Candace M. HANSON, Appellant,

v.

F. Nordy HOFFMANN, Sergeant At Arms, His Agents, Predecessors and Successors, United States Senate.

No. 78–1436.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 17, 1979.

Decided Feb. 7, 1980.

As Amended Feb. 8, 1980.

Linda B. Berg, Washington, D. C., for appellant.

Andrew J. Levander, Asst. to the Sol. Gen., Washington, D. C., with whom Barbara Allen Babcock,* Asst. Atty. Gen., Earl Silbert **, U. S. Atty., Robert E. Kopp, Atty., Dept. of Justice, Washington, D. C., were on the brief, for appellee.

Also Kent L. Jones, Atty., Dept. of Justice, Washington, D. C., entered an appearance, for appellee.

Before LEVENTHAL *** and WALD, Circuit Judges, and PENN ****, United States District Judge for the District of Columbia.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

Candace Hanson appeals from dismissal of her claims of sex discrimination in employment. For the reasons which follow we reverse and remand for the development of a factual record on which to predicate a judgment.

## I. BACKGROUND OF THE CASE

The facts as alleged in plaintiff's complaint, and supplemented by an affidavit filed in response to defendant's motion to dismiss—which we take as true for purposes of this appeal—are set forth below.

Candace M. Hanson was a telephone operator at the United States Capitol Telephone Exchange[1] from February 1, 1972 until her dismissal on May 21, 1976. In August, 1975, the Sergeant at Arms for the United States Senate, F. Nordy Hoffmann, promulgated a written personnel policy dealing, *inter alia*, with annual leave, sick leave and maternity leave.

Several months after its promulgation, Ms. Hanson became pregnant. She thereafter made repeated inquiries to her superiors about how the maternity leave policy would be applied to her situation. These inquiries were a direct cause of her dismissal.

Ms. Hanson brought suit against the Sergeant at Arms in both his official and individual capacities for declaratory judgment and injunctive relief, back pay and damages. She alleged that the defendant's conduct and the maternity leave policies discriminated against her on the basis of sex in violation of the United States Constitution. The defendant moved to dismiss on the grounds that the complaint failed to state a claim, and on the grounds that defendant enjoyed sovereign immunity from suit as a United States official and absolute immunity as an individual.

An affidavit submitted in support of the motion to dismiss set forth the text of the policy at issue. Plaintiff does not dispute this statement of the policy, the relevant parts of which follow:

(3) *Annual Leave*

The amount of annual leave granted to employees of the Capitol Exchange will be determined by an employee's length of Federal Service. More specifically, an employee having completed:

| | | |
|---|---|---|
| 6 months' service | — | will have 5 days; |
| 1 years' service | — | will have 10 days; |
| 2 years' service | — | will have 15 days; and |
| 3 years' service | — | will have 20 days. |

* Assistant Attorney General at the time the brief was filed.

** United States Attorney at the time the brief was filed.

*** Circuit Judge Leventhal was a member of the panel which considered this case but died before the opinion was issued.

**** Sitting by designation pursuant to 28 U.S.C. § 292(a).

1. According to an affidavit submitted in support of defendant's motion to dismiss, "the U.S. Capitol Telephone Exchange is operated under the joint jurisdiction of the Sergeant at Arms of the Senate and the Clerk of the House of Representatives." Appendix (App.) 9. The policy at issue here was established jointly by them. *Id.*

Vacation schedules will be made in accordance with employees' seniority at the Capitol Exchange. Requests for vacations will be made and published at least six months in advance. This annual leave policy is effective January 1, 1976, for incumbent employees and August 1, 1975, for all new employees. Annual leave cannot be carried over to the next calendar year.

### (4) Sick Leave

Sick leave will be granted to an employee in the amount of 12 days per calendar year for reasons of personal illness of the employee only. This leave may be taken on an hourly basis and one hour shall be charged for each whole hour taken or fraction thereof. Absences in excess of ·12 days will be charged against annual leave. Exceptions to this policy will be made in those cases of catastrophic illnesses or injuries when granted at the judgment of the Senate Sergeant At Arms or the Clerk of the House.

### (5) Maternity Leave

Maternity leave is a period of approved absence for reasons of pregnancy and confinement. It can be charged to sick leave or a combination of sick leave and annual leave. Neither annual leave or sick leave will be advanced for this purpose. Generally, eight weeks should be considered as a maximum period to be absent because of pregnancy and confinement for those employees wishing to be reinstated. If an employee should require more than this eight-week period, the request must be made by a doctor's certificate recommending such additional time and must be submitted to the Chief Operator for approval.

App. 11–12.

The district court agreed with defendant's argument below that under the principles announced in *Geduldig v. Aiello*, 417 U.S. 484, 94 S.Ct. 2485, 41 L.Ed.2d 256 (1974) and *General Electric Co. v. Gilbert*, 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976), plaintiff's allegations about the Exchange maternity leave policy failed to state a claim of sex-based discrimination.

Discussing *Gilbert* and *Geduldig* in its opinion the district court stated:

In those cases the Supreme Court held that the program in question, a disability program which did not cover pregnancy, divided "potential recipients into two groups—pregnant women and non-pregnant members. It is clear that while the first group is exclusively female, the second group includes members of both sexes. This precluded a finding of gender-based discrimination, since the second group contained members of both sexes.

In this case, plaintiff Hanson's allegations are similar. She is in effect claiming that the personnel policies of the Telephone Exchange divides employees into two groups, pregnant women and non-pregnant members. Therefore, according to the two Supreme Court decisions cited above, the maternity leave policies of the Telephone Exchange are not facially discriminatory and do not constitute gender-based discrimination.

These policies concerning pregnancy are not the same as the sexually discriminatory policies found in *Frontiero v. Richardson*, 411 U.S. 677 [93 S.Ct. 1764, 36 L.Ed.2d 583] (1973) and *Reed v. Reed*, 404 U.S. 71 [92 S.Ct. 251, 30 L.Ed.2d 225] (1971). Those policies definitely stated that they were applicable to men and women, thus dividing the population into two classes, each consisting solely of members of one sex. As the Supreme Court stated in *Geduldig*, "While it is true that only women can become pregnant, it does not follow that every . . classification concerning pregnancy is a sex-based classification." *Geduldig*, 417 U.S. at 496–497 n. 20 [94 S.Ct. at 2491–2492].

App. 44.

While admitting that "policies appearing to be facially neutral can in fact be discriminatory if they have that practical effect," the court went on to find that "[n]o such invidiously discriminatory effect has been shown in the instant case." App. 45. In so finding the court appears to have relied on the facial terms of the plan to reach a conclusion contrary to that alleged in the complaint. The court's opinion concluded:

Plaintiff Hanson alleges that the said personnel policies terminate the position of any woman forced to take the maximum maternity leave provided for in the policies. This is inaccurate, as the policies provide for additional periods of leave when a request therefor is accompanied by a doctor's certificate recommending such additional leave. The policy does not terminate individuals who take the maximum leave and in fact makes provision for additional leave.

*Id.* The court rejected an argument under *Cleveland Board of Education v. LaFleur*, 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974) and *Eisenstadt v. Baird*, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972) to the effect that the Constitution prohibits the imposition of penalties upon the child-bearing decision, even if it does not forbid the withdrawal of benefits,[2] concluding, "The instant policies are flexible enough not to penalize anyone for exercising their constitutional right to have children." App. 46.

Finally, the court held that plaintiff had failed to allege injury as a result of the policies attacked.

She alleges only that the personal policies of the Telephone Exchange do not permit the accumulation of enough leave to permit an individual to take eight weeks of leave for maternity purposes. Plaintiff, however, makes no claim that eight weeks maternity leave is minimally necessary as a general proposition for all individuals or that eight weeks was minimally necessary in her case. Therefore plaintiff fails to allege that she was injured by the leave policy. In fact, plaintiff alleges that she was terminated for an entirely different reason—because she sought a clarification of the office's maternity leave policies.

App. 46–47.

## II. THE VALIDITY OF PLAINTIFF'S CLAIM

We disagree with the district court's dismissal of the complaint. We find that the Exchange policy on its face is not so clearly

non-discriminatory under relevant Supreme Court cases as to mandate a conclusion that plaintiff "can prove no set of facts in support of h[er] claim which would entitle h[er] to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). Sex discrimination law often takes a "meandering course," *Nashville Gas. Co. v. Satty*, 434 U.S. 136, 148, 98 S.Ct. 347, 354, 54 L.Ed.2d 356 (1977) (Powell, J., concurring), and we do not wish to "constrict[ ] unnecessarily the scope of inquiry . . . by holding prematurely that [plaintiff] has failed to meet her burden of establishing a prima facie case that [defendant's] sick-leave policy is discriminatory . . . ." *Id.* at 147, 98 S.Ct. at 354. We also think that plaintiff's inquiries concerning the policy's possibly discriminatory application are not clearly precluded from protection under prevailing first amendment analysis. The record is sufficiently undeveloped and the facts sufficiently disputed that the district court's judgment cannot be affirmed under either a fifth amendment or a first amendment analysis. Because we think plaintiff should have an opportunity to develop the facts, we reverse and remand.

### A. *Plaintiff's Fifth Amendment Claim*

#### 1. *The Ambiguity of the Exchange Policy*

■ Ms. Hanson alleged in her complaint, para. 8 that the

Personnel Policies, as will be more fully shown on trial, prevented the accumulation of adequate leave which could be used for the purposes of maternity leave, thereby denying all health insurance benefits to, and terminating the position of, any woman forced to take the maximum maternity leave provided for in said Personnel Policies.

App. 2.

She further submitted an affidavit in opposition to the defendant's motion to dismiss the complaint in which she alleged

8. That defendant's disbursing office informed her that defendant *did not*

---

2. The benefit-burden distinction in the pregnancy/maternity context was subsequently embraced by the Supreme Court under Title VII.

*Nashville Gas Co. v. Satty*, 434 U.S. 136, 98 S.Ct. 347, 54 L.Ed.2d 356 (1977). See discussion below.

*permit any type of leave without pay and at the time her accumulated annual or sick leave ran out she would be taken off the payroll.*

9. That in addition, defendant's disbursing office informed her that at the time an employee is taken off the payroll all of her Blue Cross coverage would cease.

10. That from January 1976 up to approximately May 8, 1976 she attempted verbally to receive clarification from her supervisors concerning the status of her position and health insurance during the entire period of maternity leave provided for by the "Personnel Policies." However, no clarification was received.

11. On May 8, 1976 when she was seven months pregnant, she wrote to Mrs. Josephine Collins, Chief Operator of the U.S. Capitol Telephone Exchange, requesting "clarification of the policy pertaining to employee maternity leave."

12. That defendant responded to her request on May 21, 1976 by a letter in which he dismissed her, stating that the policy "as enunciated is emphatically clear" and that he "know(s) of no way to restate the policy to make it more lucid."

App. 40 (emphasis supplied).[3]

Defendant maintains that the policy on its face provides not only for eight weeks' maternity leave as a matter of course, but for extensions by special request if validated by a doctor's certificate.[4] He admits that a pregnant woman would not be paid or continue to receive health insurance coverage during maternity leave once her accumulated sick and annual leave ran out,[5] but asserts in his brief that ·in practice "the Senate Telephone Exchange has  .  .  . routinely allowed employees who would otherwise go off the payroll during the course of a leave for maternity or other purposes to work out an extension of payroll coverage," by taking half-pay during the last few weeks of their active employment and receiving the other half when their annual-sick leave pay runs out. Brief for Appellee at 7–8 n. 5. To construe the policy to fire a woman when her annual-sick leave runs out, defendant contends, is a "tortured" reading. Brief for Appellee at 7 n. 4. The district court termed such a reading "inaccurate". App. 45.[6]

It is not at all clear to us that plaintiff's concerns (1) about retaining her job after her accumulated annual and sick leave expired; and (2) about receiving pay and insurance benefits during maternity leave, were unreasonable. It does not need a "tortured" reading of the policy to say that the taking of eight weeks' maternity leave would endanger a woman's job status if she had not accumulated that much annual and sick leave. Plaintiff was the first woman in her office to become pregnant following

---

3. In its consideration of the motion to dismiss the district court appears to have read the complaint as if amended to incorporate the undisputed terms of the personnel policy. The policy's terms were submitted to the court through an affidavit in support of defendant's motion to dismiss. Plaintiff's affidavit in opposition does not dispute the terms of the policy but does allege an unfavorable interpretation of the policy by "defendant's disbursing office." As a general matter, of course, under Rule 12(b)(6), Fed.R.Civ.P., if matters outside the pleadings are presented to and not excluded by the court, the motion is to be treated as one for summary judgment and parties are to be given reasonable opportunity to present all material made pertinent under Rule 56.

4. Defendant also says that a pregnant employee who must remain home longer than eight weeks might be eligible under the "catastrophic illness' exception of the policy's Sick Leave provisions. Brief for Appellee at 7.

5. Defendant also admits that an employee who is off the payroll for more than 30 days loses "certain career benefits." *See* 2 U.S.C. § 60j (1976).

6. The court read the policy as providing for additional leave automatically on request and medical recommendation. It is not clear to us, however, that the policy on its face assures additional leave upon submission of such a request and recommendation; it speaks of "submitting" the request "for approval."

the issuance of the policy; the maternity leave policy had not previously been applied, and she apparently was not told the reassuring interpretations defendant now proffers. If we believe the allegations in her affidavit, she was told by the disbursing officer that when her leave ran out she would be taken off the payroll and that the Exchange did not permit any type of leave without pay. App. 40. For her persistence in her efforts to obtain clarification, plaintiff was fired.

### 2. The Controlling Law Concerning Sex Discrimination

The district court noted that constitutional claims of sexual discrimination based on an employer's refusal to grant sick pay on the same terms for pregnancy as for illnesses or disabilities are foreclosed under *Geduldig, supra*, unless the policy can be shown to be a "pretext" for sexual discrimination. *See Nashville Gas Co. v. Satty, supra*, 434 U.S. at 143, 98 S.Ct. at 352 (equating sick leave pay with disability insurance benefits, the latter of which were at issue both in *Geduldig, supra*, and *Gilbert, supra*).

But, as the district court recognized, *Geduldig* did *not* hold that the exclusion of pregnancy or maternity absence from disability benefits can never be found unconstitutionally discriminatory. A plan where "distinctions involving pregnancy are mere pretexts designed to effect an invidious discrimination against the members of one sex" will not pass constitutional muster. *Geduldig*, 417 U.S. at 496 n. 20, 94 S.Ct. at 2491–2492. *See Washington v. Davis*, 426 U.S. 229, 248, 96 S.Ct. 2040, 2051, 48 L.Ed.2d 597 (1976); *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 99 S.Ct. 2282, 2292–93, 60 L.Ed.2d 870 (1979). *See also Gilbert, supra*, 429 U.S. at 136, 97 S.Ct. at 408; *Satty, supra*, 434 U.S. at 143–44, 98 S.Ct. at 352.

In this case, for instance, if the plan were to operate to prevent employees from accumulating the eight weeks of leave which may be necessary for childbirth (*see Gilbert, supra*, 429 U.S. at 130 n. 6, 97 S.Ct. at 405 (repeating the findings of the district court)) and if no further leave were allowed except under the terms of the plan, then the plan may produce a discriminatory effect which in turn may be proved "pretextual."

Moreover, within the Title VII realm the Supreme Court has recently supplemented its "pretextual" analysis of discrimination in maternity policies by drawing a distinction between employer policies that penalize (through loss of employment opportunities attendant upon loss of seniority rights) a woman who becomes pregnant and the *Gilbert-Geduldig*-type policies which deny her benefits of a health plan during maternity leave.

Petitioner's decision not to treat pregnancy as a disease or disability for purposes of seniority retention is not on its face a discriminatory policy. . . .

We have recognized, however, that both intentional discrimination and policies neutral on their face but having a discriminatory effect may run afoul of § 703(a)(2) [42 U.S.C. § 2000e(a)(2) (1976)]. *Griggs v. Duke Power Co.*, 401 U.S. 424, 431, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). It is beyond dispute that petitioner's policy of depriving employees returning from pregnancy leave of their accumulated seniority acts both to deprive them "of employment opportunities" and to "adversely affect [their] status as an employee."

. . . . .

Here, by comparison, petitioner has not merely refused to extend to women a benefit that men cannot and do not receive, but has imposed on women a substantial burden that men need not suffer. The distinction between benefits and burdens is more than one of semantics. We held in *Gilbert* that § 703(a)(1) [42 U.S.C. § 2000e(a)(1) (1976)] did not require that greater economic benefits be paid to one sex or the other, "because of their differing roles in 'the scheme of human existence,'" 429 U.S., at 139, n. 17, 97 S.Ct., at 410, n. 17. But that holding does not allow us to read § 703(a)(2) to permit an employer to burden female employees in

such a way as to deprive them of employment opportunities because of their different role.

*Satty, supra,* 434 U.S. at 140–42, 98 S.Ct. at 351.[7]

It is not entirely unthinkable that an analogous distinction might be drawn in the scrutiny of maternity leave policies under the Constitution. We are reluctant, however, to engage in extended analysis of the implications of *Satty* without an adequate factual record. Plaintiff should be permitted to present the facts and her analysis of them to the district court.

Ms. Hanson contends that the Exchange plan imposes a burden upon women who take maternity leave. She alleges that the plan envisioned "terminating the position" of any woman who took the full eight weeks' pregnancy leave, complaint para. 8, App. 2, and her affidavit states that her inquiries were directed not only at pay and insurance coverage during the leave period but at the continuing "status of her position," affidavit para. 10, App. 40. If a pregnant woman under this plan risked both loss of her job by continuing on maternity leave beyond the expiration of her accumulated annual-sick leave, and consequent denial of accumulated "continuous service" for purposes of "longevity compensation," 2 U.S.C. § 60j (1976), should she return, when employees disabled for other reasons do not risk similar losses (because of the catastrophic illness provision), pregnant workers may be saddled with a discriminatory sex-based burden.

We note additionally that the plan may "burden" or discriminatorily affect women in another fashion; that is, women may have to struggle with the plan's ambiguity, risking discharge for seeking clarification, when men would not be subjected to this difficulty. Thus, the ambiguity in the policy itself may amount to a sex-based discrimination, even if the way the policy operates in practice is otherwise entirely valid.

Particularly in light of the rapid and not always predictable turns in the evolution of sex discrimination law we are not able to conclude on the basis of the complaint or affidavits that a substantive claim of discrimination in violation of the fifth amendment was clearly foreclosed. The critical point is that the maternity leave policy lent itself to different interpretations and applications, including some that might be determined to be sex-discriminatory.

In *Davis v. Passman,* 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979), the Supreme Court held, pretermitting the question of immunity, that an implied cause of action exists under the fifth amendment's due process clause for discriminatory denial of employment opportunities based upon sex. Ms. Hanson's complaint can be read to allege such a discriminatory denial. The nexus between the existence of a discriminatory policy and the dismissal of a covered employee who inquires about the policy's application is not, we think, too tenuous to support a finding of causation. An employee dismissed for inquiring about a discriminatory policy may well have been injured by that policy and we disagree with the contrary conclusion of the district court. To rule otherwise would invite evasion of the fifth amendment through artful drafting of purposely ambiguous plans and terminations of employees for indiscretions in asking troublesome questions about the plans. Plaintiff should be allowed to develop, at least by discovery and possibly by trial, her claim based on the discriminatory nature of the policy and its causal relationship to her dismissal.

## B. *Plaintiff's Possible First Amendment Claim*

■ Plaintiff alleges that she was terminated for asking legitimate questions about the possible discriminatory effects of the Exchange Policy. Stated this way it is clear that there is a thread of first amendment theory interwoven with plaintiff's

---

7. *See also* concurring opinion of Mr. Justice Stevens, "[the] distinction may be pragmatically expressed in terms of whether the employer has a policy which adversely affects a woman beyond the term of her pregnancy leave." *Id.* at 155, 98 S.Ct. at 358.

fifth amendment claims. The thread is especially prominent when the causal relationship between the underlying fifth amendment right and plaintiff's dismissal is examined. This is because the right to explore and discuss constitutional rights springs both from the substantive right itself, and from the fundamental right of free speech.

This record does not reveal the scope or nature of the questions which triggered the rather remarkable penalty of dismissal. The reaction itself, however, suggests that Ms. Hanson's questions might have been understood to be, if they were not in fact intended to be, an expression of criticism and a plea for reform rather than a simple request for clarification.

Both the Supreme Court and this court have on several occasions discussed the nature and limitations of a government employee's right to be publicly critical of his or her employer's actions and policies. In each case the availability of first amendment protection has turned upon the result of a "balancing test."

*Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), involved a schoolteacher who was dismissed from his position "for sending a letter to a local newspaper in connection with a recently proposed tax increase that was critical of the way in which the Board and the district superintendent of schools had handled past proposals to raise new revenue for the schools." *Id.* at 564, 88 S.Ct. at 1732–33. The Court determined that the outcome of the case depended on "a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* at 568, 88 S.Ct. at 1734–35. Balancing these interests, the Court found the teacher's dismissal unjustified (absent proof of false statements knowingly or recklessly made) and accordingly reversed the state court judgment to the contrary. *Id.* at 569–75, 88 S.Ct. at 1735–1738.

The Court recently reaffirmed the *Pickering* balancing test, albeit in the context of a decision concerning the necessary causal connection between protected conduct or speech and the public employer's challenged action. *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 284, 97 S.Ct. 568, 574, 50 L.Ed.2d 471 (1976) (protected conduct will not immunize employee from actions for which employer has valid independent reasons).

We have ourselves reviewing the "balancing" process in several cases involving public employees' exercise of their right to speak out. In *Tygrett v. Washington*, 177 U.S.App.D.C. 355, 543 F.2d 840 (D.C.Cir. 1974), we said that a probationary policeman could not be discharged for speaking to the press about a bill proposing a pay raise and for suggesting to the press the possibility of a "sick in" if the bill did not pass. We there held that discharge for the policeman's conduct would not be proper unless it could be shown that his statements "adversely affected his efficiency as a police officer or the efficiency of the Department as a police force." *Id.* 177 U.S.App.D.C. at 365, 543 F.2d at 850.

> Governmental action affecting fundamental rights does not enjoy a presumption of constitutionality; rather, the burden is upon government to show a compelling governmental interest justifying the intrusion. Governmental infliction of a penalty for speech arguably protected by the First Amendment falls squarely within the compass of this requirement.

*Id.* 177 U.S.App.D.C. at 364, 543 F.2d at 849 (footnote omitted).

In *Ring v. Schlesinger*, 164 U.S.App.D.C. 19, 502 F.2d 479 (D.C.Cir.1974) we applied *Pickering, supra,* to the dismissal of a federally-employed teacher for writing portions of a memorandum critical of her school's principal and sending the memo both to the commanding officer of the Naval station where she taught and to other senior officials. We there held that the evidentiary record before the district court was insufficient to support summary judgment for the government defendants.

Mrs. Ring has had no hearing, and there was no evidentiary material based on the sworn testimony of witnesses from which the District Court might have gleaned the facts. There was no evidence that the statements made by Mrs. Ring were true or false, or, if false, whether she knew they were so or whether she made the statements with reckless disregard of their truth or falsity.

.    .    .    .    .

In granting summary judgment to the Government without a hearing, the District Court held that the *Commanding Officer* had balanced [the respective parties' interests] .   .   ..

.    .    .    .    .

[But t]he balancing here of First Amendment freedoms against an asserted governmental interest requires the judgment of the *District Court.*

*Id.* 164 U.S.App.D.C. at 29–30, 502 F.2d at 489–90 (emphasis supplied).

In *Waters v. Peterson,* 161 U.S.App.D.C. 265, 495 F.2d 91 (D.C.Cir.1973), we said that the Census Bureau employees who displayed a placard demanding "Pigs Off Census" during a lunchtime demonstration at the agency cafeteria could not be suspended if their suspension

was predicated,  .   .   . on the mere content of the sign they displayed as part of their demonstration. Government employees have protection of First Amendment freedoms even when their speech is critical of or embarrassing to their superiors, albeit this doctrine is subject to certain limitations. *Pickering, supra; Meehan v. Macy,* [infra]. As already noted, the "fighting words" concept is an exception to protected speech, but we do not think that present record established a predicate for that exception. This is so even though the immunity of government employees from sanction is not necessarily co-extensive with the immunity of citizens from prosecution for speech on the public way.

*Id.* 161 U.S.App.D.C. at 272, 495 F.2d at 98.

On the other hand, in *Meehan v. Macy,* 129 U.S.App.D.C. 217, 392 F.2d 822 (D.C.

Cir.) *modified,* 138 U.S.App.D.C. 38, 425 F.2d 469 (1968) (scope of inquiry on remand enlarged in light of *Pickering, supra* ), *aff'd on rehearing en banc,* 138 U.S.App.D.C. 41, 425 F.2d 472 (1969), we sanctioned dismissal of Panama Canal Zone policemen for publicity disseminating "intemperate and sarcastic" criticism of the Governor's planned use of native Panamanians to augment the police force in a riot-prone situation. At the same time we recognized:

One who enters the routine service of the Government cannot be forced to cede all of his protections from Governmental excesses. Whatever liberties a private employer might have or take, the Government cannot disregard the Bill of Rights merely by calling on its prerogative to hire and fire employees.

129 U.S.App.D.C. at 227, 392 F.2d at 832 (footnote omitted).

Some of the factors that appear to have entered into the "balancing" in such cases include the sensitivity and confidential nature of the employee's position and the government's consequently legitimate need for secrecy; the nature of the subject on which the employee speaks out; the truth or falsity of the employee's statement; any interference with the performance of his job resulting from the speech; the context of the speech and accompanying conduct; its anticipated effect on agency morale and upon working relationships with immediate superiors. *See Meehan, supra,* at 227–230, 392 F.2d at 832–35; *Waters, supra,* 161 U.S.App.D.C. at 268–273, 495 F.2d at 94–99; *Pickering, supra,* 391 U.S. at 568–74, 88 S.Ct. at 1734–1737; *Goldwasser v. Brown,* 135 U.S.App.D.C. 222, 228–229, 417 F.2d 1169, 1176–77 (D.C.Cir.1969). *See also Harper v. Blumenthal,* 478 F.Supp. 176, 182 (D.D.C.1979) (Sirica, J.).

The relevance of these cases to this plaintiff's situation derive from the Supreme Court's pronouncement in *Givhan v. Western Line Consolidated School District,* 58 L.Ed.2d 619, 99 S.Ct. 693, 439 U.S. 410, (1979) that "private expression of one's views is [not] beyond constitutional protection." *Id.* at 695.

This Court's decisions in *Pickering, Perry [v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972)] and *Mt. Healthy* do not support the conclusion that a public employee forfeits his protection against governmental abridgement of freedom of speech if he decides to express his views privately rather than publicly.

. . . . .

The First Amendment forbids abridgement of the "freedom of speech." Neither the Amendment itself nor our decisions indicate that this freedom is lost to the public employee who arranges to communicate privately with his employer rather than to spread his views before the public.

*Id.* at 695–97.

In the *Givhan* case, the plaintiff schoolteacher had complained to her principal about blacks not being hired in the school cafeteria, failure to integrate the school's administrative staff and assignment of Neighborhood Youth Corps workers to exclusively janitorial jobs. *See Ayers v. Western Line Consolidated School District,* 555 F.2d 1309, 1313 (5th Cir. 1977). The district court had found that the failure to renew her contract was traceable to her criticism of the policies and practices of the school, and that contrary to the school authorities' contention plaintiff's requests

"were neither 'petty' nor 'unreasonable', insomuch as all of the complaints in question involved employment policies and practices at [the] school which [petitioner]

conceived to be racially discriminatory in purpose or effect"

99 S.Ct. at 695 (quoting the district court).

We have no record here on the nature of Ms. Hanson's inquiries or complaints about the maternity leave policy, *e. g.,* how many there were, how they were delivered, the tone of her questions or demands, the effect, if any, of her questioning on her peers and superiors. Proof on such matters would have to be tendered for the district court to do any proper "balancing." *See Ring v. Schlesinger, supra.* The *Givhan* Court noted that the "balancing" test might work differently when applied to private expressions, with more weight given to the effect of the manner, time and place of delivery, as well as to the content of the expression. *Id.* at 696 n. 4.

We take Ms. Hanson's inquiries to have been facially addressed to or understood to be related to an underlying substantive right to be free of sex discrimination in employment. A request to clarify an ambiguous policy even if unrelated either objectively or subjectively to an underlying constitutional or statutory right, however, is not clearly unprotected by the first amendment.[8] We assume, however, that a line must be drawn somewhere in the balancing process to exclude from protection entirely petty or frivolous questions or complaints. *See Givhan, supra* at 695 (noting the district court's conclusion that Ms. Givhan's "demands" were neither "petty" nor "unreasonable").

We think that the clarity or ambiguity of the underlying right to which the inquiry relates is one—and perhaps an important—

---

8. The first amendment's protection of petitions to redress grievances has been considered by some to extend to the grievances of public employees. *See generally Swaaley v. United States,* 376 F.2d 857, 180 Ct.Cl. 1 (1967) (first amendment right to petition for redress extends to civilian Navy employee's letter to the Secretary of the Navy concerning favoritism in promotions); *Turner v. Kennedy,* 118 U.S.App. D.C. 104, 332 F.2d 304 (D.C.Cir.) (Fahy, J. dissenting), *cert. denied,* 379 U.S. 901, 85 S.Ct. 189, 13 L.Ed.2d 175 (1964); T. Emerson, The System of Freedom of Expression, 571–72 (1970). Moreover, 5 U.S.C. § 7102 (1970) pro-

tects the right of civil service employees "to petition Congress or a Member of Congress, or to furnish information to either House of Congress, or to a committee or Member thereof". Although excluded from the full panoply of civil service protections, *see* 5 U.S.C. §§ 7501 & 2102 (1976) (extending protections to those within the civil service who are also in the competitive service), plaintiff appears to have been protected by § 7102. *See* 5 U.S.C. §§ 2101(1) & 2105(a) (1976); *Bullock v. Mumford,* 166 U.S.App.D.C. 51, 54, 509 F.2d 384, 387 (D.C.Cir.1974).

factor in the determination whether the inquiry is made in good faith. The good or bad faith of the inquiry is in turn one factor to be considered in determining whether the inquiry is protected under the first amendment. All we decide here is that the existence of the underlying right asserted was not so clearly foreclosed either as a matter of construction of the plan or as a matter of the controlling law as to mandate a finding that the inquiry was made in bad faith. *Cf. Pickering, supra*, 391 U.S. at 574 n. 6, 88 S.Ct. at 1738 (reserving question whether knowingly or recklessly false statements might still be protected by first amendment).

We recognize too that in context the asking of questions may prove as disruptive as, or more disruptive than, the making of statements. But neither the first amendment nor common sense can draw a bright line between questions and statements. Questions often if not always express views.

We think our decision is supported by the rationale underlying the prohibition against retaliatory treatment which plays so prominent a role in the creation of statutory rights in employment. Employees protected by Title VII, for example, are protected against retaliation for opposition to "any practice made an unlawful employment practice by this title" and for participation "in any investigation, proceeding or hearing under this title." 42 U.S.C. § 2000e–3(a) (1976). *See Pettway v. American Cast Iron Pipe Co.*, 411 F.2d 998, 1005–06 (5th Cir. 1969). The National Labor Relations Act protects employees against reprisal for some organizational activities, *e. g.*, 29 U.S.C. § 158(a)(3) (1976) (unfair labor practice for employer "by discrimination in regard to hire or tenure of employment . . . to encourage or discourage membership in a labor organization") (*see NLRB v. Erie Resistor Corp.*, 373 U.S. 221, 83 S.Ct. 1139, 10 L.Ed.2d 308 (1963)); 29 U.S.C. § 158(a)(4) (1976) (unfair labor practice for employer "to discharge or otherwise discriminate against an employee because he has filed charges or given testimony" under the Act).

The creation of a right is often meaningless without the ancillary right to be free from retaliation for the exercise or assertion of that right. *Cf. United States v. Jackson*, 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968) (death penalty may not be imposed solely on those who exercise their constitutional right to a jury trial); *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965) (penalty in form of comment by court and prosecutor may not be imposed on the exercise of one's fifth amendment right to silence). *See also Shapiro v. Thompson*, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) (burden in form of residency requirement for welfare benefits may not be imposed on constitutional right to travel, absent compelling justification); *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) (burden in form of choice between receiving unemployment benefits or observing the Sabbath may not be imposed on right of free exercise of religion, absent compelling state interest). *But see Wyman v. James*, 400 U.S. 309, 91 S.Ct. 381, 27 L.Ed.2d 408 (1971) (termination of benefits under New York's Aid to Families With Dependent Children program for refusal of required home visit not violative of fourth amendment right to be free of unreasonable searches). As *Pettway, supra*, recognized, the need for such protection is especially great in the employment context. Retaliation for mere inquiries relating to one's right is a subtle and insidious means of evading a statutory mandate or a constitutional command. Drawing the scope of first amendment protection too narrowly would permit a public employer who is not otherwise forbidden from retaliation to evade his constitutional responsibilities. We recognize that the standards of protection applied under the first amendment may not be strictly analogous to the standards applied under Title VII, but the principle of protection is essentially similar, and similarly essential.

We raise the first amendment questions implicit in plaintiff's complaint with the realization both that she did not explicitly rely on the first amendment theory and that if, on remand, she decides to pursue

this theory by amendment or otherwise, the defendant must be given his opportunity to answer on the merits. We recognize that the application of first amendment analysis to protect the intra-office inquiries of government employees raises many questions for which firm answers do not seem possible. A few of these questions have been adverted to in our discussion above.[9]

We believe, however, that plaintiff should be permitted to avail herself of the opportunity to make out a first amendment claim on remand. One reason why she did not explicitly do so before may be that prior to *Givhan* it was not clear that a public employee's private communications to superiors were constitutionally protected.[10] On this account alone we would be inclined to permit plaintiff to proceed under the first amendment. The basic factual allegation is already there, *i. e.*, that her dismissal resulted from her inquiries about the plan. A generous reading of her present complaint can encompass a free speech claim.

█ The Federal Rules of Civil Procedure require only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a). The liberal concepts of notice pleading embodied in the Federal Rules do not require the pleading of legal theories. *Siegelman v. Cunard White Star*, 221 F.2d 189 (2d Cir. 1955) (Harlan, J.).[11] Defendant will of course have an opportunity to defend against such a claim.

We cannot tell at this point whether plaintiff can make out a successful case to warrant constitutional protection for her inquiries. But we think she should have the chance.

## III. CONCLUSION

We reverse the dismissal of plaintiff's complaint and remand to the district court to allow her to develop, if possible, the necessary facts to show that her requests to clarify the maternity leave policy fell within the protection of the fifth and first amendments as explicated in this opinion. We leave to the district court as an initial matter the related (*see Davis v. Passman, supra*, 99 S.Ct. at 2277 n. 24) questions of determination of the scope of defendant's immunity, if any, and the nature of the relief which may be granted plaintiff.[12]

*Reversed and remanded.*

---

9. *E. g.*, in what circumstances are questions or inquiries to be viewed as "expressions" under the first amendment? Is a first amendment right to ask a question of a government official limited to questions concerning matters of "public importance," including possible statutory or constitutional claims, or may more mundane inquiries also be protected?

10. *See Hildebrand v. Bd. of Trustees of Mich. State Univ.*, 607 F.2d 705, 712–13 (6th Cir. 1979) (reversing, *inter alia*, on the grounds of the intervening Supreme Court decision in *Givhan* ).

11. Unless a defendant is prejudiced on the merits by a change in legal theory, a plaintiff is not bound by the legal theory on which he or she originally relied. *See* 5 C. Wright & A. Miller, Federal Practice and Procedure § 1219 at 144–46 (1969). A court may deny a motion to dismiss or for summary judgment, *Int'l Distrib.* *Corp. v. Am. Dist. Tel. Co.*, 186 U.S.App.D.C. 305, 308, 569 F.2d 136, 139 (D.C.Cir.1977); *Dotschay v. Nat'l. Mut. Ins. Co*, 246 F.2d 221, 223 (5th Cir. 1957), on the basis of a legal theory never embraced by the plaintiff, as long as that theory is supported by the facts alleged and as long as the defendant is not prejudiced on the merits. *See* Wright & Miller, *supra*.

12. The Supreme Court has not expressly addressed the question after *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), whether monetary relief may be recovered on a *Bivens* theory under the first amendment. This court has, however, addressed the question and has determined that such relief is available. *Dellums v. Powell*, 184 U.S.App.D.C. 275, 302–303, 566 F.2d 167, 194–95 (D.C.Cir.1977).