Craig V. McDONOUGH, Plaintiff,
Appellant,

v.

TRUSTEES OF the UNIVERSITY
SYSTEM OF NEW HAMPSHIRE,
et al., Defendants, Appellees.

No. 82–1656.

United States Court of Appeals,
First Circuit.

Argued Feb. 3, 1983.

Decided April 11, 1983.

Robert L. Hernandez, Watertown, Mass.,
with whom Michael W. Dingle, Watertown,
Mass., was on brief, for plaintiff, appellant.

Stephen E. Merrill, Manchester, N.H.,
with whom Devine, Millimet, Stahl &
Branch, P.A., Manchester, N.H., was on
brief, for defendants, appellees.

Before BOWNES and BREYER, Circuit
Judges, and WYZANSKI,* Senior District
Judge.

BOWNES, Circuit Judge.

Plaintiff-appellant, Craig V. McDonough,
appeals from the district court's denial of

---

* Of the District of Massachusetts, sitting by des-
ignation.

his motion for a preliminary injunction. The injunction sought to prohibit defendants-appellees, the trustees of the University System of New Hampshire and various administrators of Keene State College, from terminating plaintiff's contract of employment as an associate professor at the college. Plaintiff claims his termination violates the first and fourteenth amendments of the Constitution. The district court held a hearing on June 17, 1982, at which plaintiff's affidavit as well as offers of proof by plaintiff's and defense counsel were admitted into evidence. The district court denied the preliminary injunction on the ground that plaintiff failed to show a likelihood of success on the merits.

Plaintiff, who considers himself to be a Marxian economist, was a nontenured associate professor of economics at Keene State College from August 1979 to May 1980. The administrative chain of authority required that plaintiff report to defendant Stuart Goff, who was Assistant Dean of the Division of Sciences. Goff reported to defendant William Whybrew, who was Academic Dean.

On May 1, 1981, Whybrew notified plaintiff, by letter, that his current appointment to the Keene State faculty for the 1981–82 contract year would be his last appointment at the college. This method of termination by nonreappointment was authorized by the collective bargaining agreement that governed the contractual relationship between plaintiff and the college. Under the agreement tenured faculty can only be terminated for just cause; nontenured faculty, like plaintiff, are not afforded this protection. The inferences to be drawn from the sequence of events preceding this termination are the heart of the dispute before us.

On January 23, 1981, the University of New Hampshire newspaper, *The New Hampshire,* reported on a "bloodless coup" staged by students in the American Political Economy course that was team-taught by plaintiff and Professor Charles Weed. The article quoted plaintiff as follows:

If everyone gets A's, it destroys the hierarchy. It confuses the capitalists when they are trying to figure out how much you're worth.

. . . .

Colleges are toilet-training institutions, and grades are their little price tags that tell the marketplace how much they can exploit you for. If you've been good and followed the party line, you'll get paid for it. If you've been bad and pissed the professor off, you'll be punished. Basically you're building up brownie points for when you get out.

Shortly after the publication of this article plaintiff was summoned to a meeting with defendants Goff and Whybrew. Plaintiff alleges that at this meeting on February 6, 1981, the defendants questioned him about the veracity of statements attributed to him in the article. Plaintiff refused to discuss the article because he felt Professor Weed should be present during any discussion of the American Political Economy course and because the article concerned his political views about grading. Defendants contend that they were seeking information about plaintiff's grading practices.

A second meeting was held on February 13 at which Weed and a union representative also were present. Plaintiff alleges that at this meeting Goff and Whybrew persisted in questioning plaintiff and Weed about their grading practices. Contending that his grading method involved his political beliefs, plaintiff refused to answer any questions pertaining to grading and disputed Goff's and Whybrew's authority to make any inquiry of this sort. Defendants assert that plaintiff made a tape recording of this meeting and offered transcripts of the tape to students in his classes.

Soon after the meeting Goff notified plaintiff that he was withdrawing all of his student work-study assistance, that he was not approving a course plaintiff had proposed, and that he was not permitting plaintiff to teach a summer school course that he previously had been assigned to

teach. Plaintiff claims that these actions were taken in retaliation for his political views. Defendants claim that they were responding to plaintiff's illicit taping of the February 13 meeting. Both parties claim that an arbitration decision concerning these matters vindicates their respective versions of the facts. A copy of that decision is not part of the record.

The parties' respective interpretations of the other events leading up to plaintiff's nonrenewal on May 1, 1981, are equally disputed and unverified. A partial list follows:

1. *The Center for Revolutionary Education:* Defendants claim that plaintiff, contrary to university policy, established the Center in his office and sold partisan political literature. Plaintiff asserts that no violation of university rules occurred and that the literature was distributed at no cost.

2. *The May Day Rally:* Students in one of plaintiff's upper level economics courses organized the rally as part of a class project. Plaintiff claims that he asked to be notified during the rally of any complaints about noise or other disturbances. No complaints were brought to his attention until he received a "formal reprimand" from defendant Whybrew on April 13, ten days after the rally. In this reprimand Whybrew alleged that plaintiff used college equipment and supplies as well as class time for partisan political activity, all in violation of college policy. Plaintiff was further accused of failing to meet regularly scheduled classes as well as disturbing other ongoing classes by noise from the rally.

Plaintiff contends that this reprimand singled him out for harsh treatment. He claims that the class that sponsored the rally is politically partisan by nature. Further, he asserts that he did not fail to meet scheduled classes, but told them to attend the May Day Rally. Other teachers, he claims, have sent students to extracurricular activities in lieu of classroom attendance; none has been questioned for such an assignment.

3. *Plaintiff's "vilification" of members of the college community:* Pursuant to the collective bargaining agreement, each teacher is evaluated annually. In their respective evaluation reports both the Discipline Peer Evaluation Committee, a faculty committee, and defendant Goff cited plaintiff's vilification of members of the college community, individually and as a group, as unprofessional and unethical conduct, destructive of the academic environment.

Plaintiff claims that the "vilification" to which these reports refer appeared in a newspaper account of the May Day Rally. Plaintiff, responding to a student's suggestion that he was not being professional, was quoted as stating, "Professors are scum. Professors are ideological dictators, ideological scum. S–C–U–M." Plaintiff contends that this was a statement of his political views and was not directed at any particular individuals.

Plaintiff contends that the inference to be drawn from these facts is that the sole reason for his termination was his exercise of first amendment rights. He asserts that his statements about grades in the "bloodless coup" article were protected speech and that all of defendants' actions following the article were taken in response to plaintiff's beliefs. Furthermore, his supposed vilification of members of the college community was also speech protected by the first amendment and therefore could not be the basis for any adverse action. On the other hand, defendant argues that plaintiff's termination stemmed, *inter alia,* from his refusal to cooperate in investigations into his grading methodology, his taping of the February 13 meeting, and his unprotected vilification of faculty members.

Plaintiff, despite this unresolved dispute over the facts surrounding his termination, asks us to reverse the district court's refusal to grant a preliminary injunction preventing his termination. He asserts that, contrary to the district court's determination, he has demonstrated a clear likelihood of success on the merits. The district court,

according to plaintiff, failed to apply the correct standard of law to his first amendment claim.[1]

Our review of a district court's denial of a preliminary injunction is limited.

> The decision to grant or deny a preliminary injunction is a matter for the discretion of the district court and is reversible, of course, only for an abuse of discretion. It is also well-settled, however, that the application of an improper legal standard in determining the likelihood of success on the merits is never within the district court's discretion. Similarly, misapplication of the law to particular facts is an abuse of discretion. In either of these circumstances, the denial of the preliminary injunction should be reversed and the injunction entered if necessary to protect the rights of the parties.

*Planned Parenthood League of Massachusetts v. Bellotti,* 641 F.2d 1006, 1009 (1st Cir.1981) (quoting *Charles v. Carey,* 627 F.2d 772, 776 (7th Cir.1980)). We think that the district court in applying the law to the, as yet, unresolved factual disputes abundant in this case did not abuse its discretion or commit a mistake of law. *See Massachusetts Association of Older Americans v. Sharp,* 700 F.2d 749, 752 (1st Cir.1983).

The law controlling plaintiff's claim that his discharge violated the first amendment via the fourteenth amendment is set out in two Supreme Court opinions, *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), and *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). Similarly to this case, *Mt. Healthy* involved the discharge by non-reappointment of a public school teacher who claimed that his discharge violated the

first and fourteenth amendments. The issue before the Court was how substantial a connection must be shown between plaintiff's first amendment activity and his subsequent discharge for plaintiff to prevail on his claim that the discharge violated his first amendment rights.

■ In answering this question the Court developed a test to assist the parties in marshalling the facts to show causation; that is, that the result, the discharge, was caused by a constitutional violation. *See Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. at 286, 97 S.Ct. at 575. "Initially ... the burden [is] placed upon [plaintiff] to show that his conduct was constitutionally protected, and that this conduct was a 'substantial factor'—or to put it in other words, that it was a 'motivating factor' in the [defendant's] decision not to rehire him." *Id.* at 287, 97 S.Ct. at 576 (footnote omitted). Once plaintiff has met this burden, the burden shifts to defendant to show "by a preponderance of the evidence that it would have reached the same decision ... even in the absence of the protected conduct." *Id.*

■ The initial issue of whether the activity plaintiff claims motivated his discharge is protected by the first amendment is resolved through an interest balancing analysis as prescribed by the Supreme Court in *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811; *see Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. at 284, 97 S.Ct. at 574. "The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public serv-

1. In the district court plaintiff urged that his nonrenewal also deprived him of liberty and property without due process of law. At argument before this court counsel for plaintiff conceded that these due process claims could not properly be resolved at the preliminary injunction stage. We note, nonetheless, that given our recent decisions involving similar claims, the district court did not err in concluding that plaintiff did not show a likelihood of success on the merits. *See Perkins v. Board of Directors of School Administrative District No. 13,* 686 F.2d 49 (1st Cir.1982); *Bleeker v. Dukakis,* 665 F.2d 401 (1st Cir.1981); *Beitzell v. Jeffrey,* 643 F.2d 870 (1st Cir.1981).

ices it performs through its employees." *Pickering v. Board of Education,* 391 U.S. at 568, 88 S.Ct. at 1734; *see also Hildebrand v. Board of Trustees of Michigan State University,* 662 F.2d 439, 442–43 (6th Cir.1981), *cert. denied,* 456 U.S. 910, 102 S.Ct. 1760, 72 L.Ed.2d 168 (1982); *Alicea Rosado v. Garcia Santiago,* 562 F.2d 114, 117 (1st Cir.1977).

■ Although the fact-bound analysis involved in balancing the state's versus the individual's interest makes it inappropriate to develop a general standard for determining whether speech or conduct is protected, *Pickering v. Board of Education,* 391 U.S. at 569, 88 S.Ct. at 1735, the Supreme Court has indicated "some of the general lines along which an analysis of the controlling interests should run." *Id.* Briefly, allegedly protected activity must be evaluated with an eye toward: (1) whether it was directed against those with whom plaintiff is regularly in contact such that it might impede harmony among coworkers or the ability of supervisors to maintain discipline; (2) whether plaintiff's activity has a detrimental impact on those with whom he must maintain personal loyalty and confidence for the fulfillment of his job responsibilities; and (3) with regard to erroneous statements concerning matters of public concern, whether such statement impedes plaintiff's performance of his daily duties or the regular operation of the school generally. *See id.* at 569–73, 88 S.Ct. at 1735–37; *see also Hanson v. Hoffmann,* 628 F.2d 42, 50 (D.C.Cir.1980); *D'Andrea v. Adams,* 626 F.2d 469, 474–75 (5th Cir.1980), *cert. denied,* 450 U.S. 919, 101 S.Ct. 1365, 67 L.Ed.2d 345 (1981). Ultimately, the question is whether "the interest of the school administration in limiting teachers' opportunities to contribute to public debate is ... significantly greater than its interest in limiting a similar contribution by any member of the general public." *Pickering v. Board of Education,* 391 U.S. at 573, 88 S.Ct. at 1737.

■ As is evident from the foregoing discussion, the determination of the legal issues raised by plaintiff is inextricably intertwined with a resolution of the factual disputes surrounding his discharge. *See Hanson v. Hoffmann,* 628 F.2d at 51. For example, we are unable at this stage of the proceedings to reach any conclusions about defendants' reason for discharging plaintiff. It could well be that they terminated plaintiff because he is a Marxist. But, it is equally plausible to conclude that plaintiff's grading system offended university policy. Similarly, it could be that plaintiff's views and policy as to grading are protected first amendment activity; but then again, that policy might impede the college's ability to monitor student performance. In short, the answer is that at this stage it is impossible to assess plaintiff's likelihood of success on the merits.

While we, of course, do not establish a blanket rule, we do recognize that it is difficult to obtain preliminary injunctive relief in cases, like this one, that involve intensely fact-oriented disputes. *See Bowe v. Board of Election Commissioners of Chicago,* 614 F.2d 1147, 1152–53 (7th Cir.1980); *Medical Society of New York v. Toia,* 560 F.2d 535, 538–39 (2d Cir.1977); *United States v. National Lead Co.,* 438 F.2d 935, 939 (8th Cir.1971). A similar hesitation to resolve these cases on a less than fully developed record is evidenced by the reluctance of many Circuit Courts of Appeals to approve a grant of summary judgment in *Pickering-Mt. Healthy* cases. *See, e.g., Kim v. Coppin State College,* 662 F.2d 1055, 1066 (4th Cir.1981); *Wilson v. Taylor,* 658 F.2d 1021, 1030 (5th Cir.1981); *Aebisher v. Ryan,* 622 F.2d 651, 654–55 (2d Cir.1980). Once this case is fully fleshed out before the district court, plaintiff may or may not be able to prove a violation of his first amendment rights.[2] We hold only that at this

2. The district court did not address the issue of irreparable harm, and the parties have not

raised it before us. We note only that because money damages would seem to offer a com-

preliminary stage we cannot weigh the merits of his claim and therefore cannot say that the district court abused its discretion.

We see no merit in plaintiff's appeal from the denial of his motions for specific findings and reconsideration. Similarly, the district court's grant of defendants' motion for further relief was not an abuse of its discretion.

*The district court's orders are affirmed in their entirety.*

plete remedy, the requirement of irreparable injury would also be a formidable obstacle to

the grant of a preliminary injunction.