**Duane P. BRASSLETT, Plaintiff,**

v.

**Raymond J. COTA, Jr.**

**and**

**Town of Orono, Defendants.**

**Civ. No. 83–0007–B.**

United States District Court,
D. Maine.

June 8, 1984.

Theodore S. Curtis, Jr., Curtis & Griffin, Orono, Me., for plaintiff.

Andrew M. Mead, Mitchell & Stearns, Old Town, Me., for defendants.

## MEMORANDUM DECISION

CYR, Chief Judge.

The present civil rights action under 42 U.S.C. § 1983 seeks redress for alleged violations of plaintiff's constitutional rights to due process, free speech, and equal protection of the laws, as well as for certain alleged violations of state law. Defendants deny any violation of plaintiff's constitu-

tional or statutory rights and assert that plaintiff has failed to exhaust available state remedies.[1]

Plaintiff seeks declaratory and injunctive relief, reinstatement as fire chief of the Town of Orono (Town), damages [2] and attorney fees pursuant to 42 U.S.C. § 1988.

## FACTS

The defendant Town is a political subdivision of the State of Maine and operates under a council-manager form of government. At all times relevant to the present action, defendant Raymond J. Cota, Jr. (town manager) was the duly appointed town manager of the Town. The Town Charter (Charter) vests the town manager with considerable authority to manage town affairs, including exclusive authority to appoint, subject to confirmation by the Town Council (Council), and to remove department heads. Charter § 1.1.3. The town manager is responsible for disciplining all supervisory personnel. *Id.* § 1.13.-16(3). The Charter identifies eleven categories of conduct constituting "sufficient cause" for disciplinary action, including removal, *see id.,* § 1.3.12(C); ten of which delineate specific types of conduct. The eleventh category of conduct constituting sufficient cause for disciplinary action consists of "[a]ny other such instance or situation of such seriousness that disciplinary action is considered warranted," *id.* § 1.3.-12(C)(11). Charter section 1.13.12(H) entitles a discharged employee to a written statement of the reasons for dismissal.

The Charter establishes formal grievance procedures. The aggrieved employee first must attempt to resolve the matter informally with the town manager, failing which the grievance may be submitted to the Personnel Appeals Board (Board), established under Charter section 1.1.3(C)(3). The three Board members are appointed by the Council for three-year terms. Following review, the Board is empowered to issue its advisory (nonbinding) opinion to the town manager, whose action is final. *See id.* 1.3.13(E).

Plaintiff was appointed Town Fire Chief for an indefinite term on December 3, 1979. *Cota Deposition,* at 6. *See* 30 M.R.S.A. § 3773(1). The record discloses that during his tenure as fire chief plaintiff was considered a good fireman, *see Cota Deposition,* at 24, 92, but that his performance as a department head had been called into question by the town manager on more than one occasion.

During August of 1982 plaintiff was suspended for 30 days, which was later reduced by the town manager to 15 days in response to a recommendation of the Board,[3] for transferring a fire department pickup truck to a private individual, without competitive bidding,[4] and for conduct unbecoming a public official. *Cota Deposition,* at 20. According to the plaintiff, the town manager suggested that plaintiff "get rid" of the pickup truck, which apparently was in a serious state of disrepair. Plaintiff asserts that he made several telephone calls to local junk yards to ascertain the value of the truck before eventually selling it. According to the plaintiff the town manager was aware of the sale of the truck. *Brasslett Deposition,* at 10–12. Some time later the town manager suspended the plaintiff for failure to account for the sale proceeds during a five-week period following the sale. Plaintiff lamely

**1.** Defendants correctly assert that plaintiff failed to seek judicial review of the termination of his employment. *See* Me.R.Civ.P. 80B. Under section 1983 it is well settled that neither judicial, *see Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), nor administrative, *see Patsy v. Board of Regents of the State of Florida,* 457 U.S. 496, 500, 102 S.Ct. 2557, 2559, 73 L.Ed.2d 172 (1982), remedies need be exhausted.

**2.** Plaintiff has withdrawn his claim for punitive damages.

**3.** Prior to the Board's advisory opinion, the local district attorney's office had conducted an investigation of the incident and found no evidence of criminal conduct on plaintiff's part. *Brasslett Deposition,* 13–14.

**4.** This was apparently the second incident in which plaintiff allegedly disposed of Town property without competitive bidding. *Cota Deposition,* at 20. *See Brasslett Deposition,* at 36–37.

contends that the delay in accounting for the sale proceeds was due to several major equipment breakdowns and Town budgetary concerns which distracted the plaintiff and consumed a considerable amount of time. Only when questioned by the Town clerk did plaintiff finally account for the sale proceeds. *Brasslett Deposition*, at 19. Plaintiff points out that the Town had no surplus property ordinance at the time. *Id.* at 18.

The next incident involved a fire department jeep. According to the plaintiff, several members of the fire department expressed an interest in repairing an old jeep previously used as a support vehicle, but which had been out of service for some time. A fireman asked plaintiff for permission to take the jeep home to make repairs, at no cost to the Town. Plaintiff agreed. *Brasslett Deposition*, at 20–21. After apparently having been informed by a Council member that the jeep was located in a bus garage in the City of Old Town, the town manager confronted the plaintiff. *Cota Deposition*, at 80–81. Plaintiff addressed a memorandum to the town manager explaining that the jeep was being repaired

by a fireman. The town manager responded by requesting that plaintiff keep him posted, since "past history would indicate this is a sensitive issue." *Agreed Statement of Record,* Item 11. The jeep was later returned to the Town garage at the request of the town manager. No disciplinary action was taken.

The final episode began on December 4, 1982, when plaintiff granted an on-camera interview to a local television station to discuss the status of the town's fire protection.[5] *See McLeod Deposition*, at 6. *Compare, Brasslett Deposition*, at 25. The issue of the Town's fire fighting capability had not generated any community concern or media coverage prior to plaintiff's interview. *Cota Deposition*, at 41–42. The request for an interview was initiated by the television station, *see Brasslett Deposition*, at 23, in response to an anonymous telephone call on December 3 advising that the Town had only one operational fire truck. *McLeod Deposition*, at 3–4. The interview was conducted at the Town's central fire station. The plaintiff appeared on television in his dress uniform.

5. The text of the interview is as follows:

BARBARA BOUSQUET [T.V. reporter]: Friday night, the rear end dropped out of Orono's 18 year old pumper truck. It was responding to a chemical fire at the University of Maine. Fire Chief Duane Brasslett says it's the latest in a series of problems.
CHIEF DUANE BRASSLETT: Well, right now, we've got two of 'em out of service: this particular truck, which is our lead truck, has been out of service for four weeks, and it has multiple problems: it's got a cracked frame, it's got power steering unit problems, it's got rear spring problems.
BOUSQUET: How much did this cost when you bought it?
CHIEF BRASSLETT: Thirty Thousand Five Hundred.
BOUSQUET: And how much have you put into it in repairs?
CHIEF BRASSLETT: We've put Twenty Thousand Dollars in repairs in the past twelve years; that's just major repairs; another Eighteen Thousand Dollars in minor maintenance on it such as gauges, lines, other things like that.
BOUSQUET: Two of Orono's three pumper trucks were bought new; the third, a tanker, and an aerial ladder truck were bought used.

Brasslett says a major problem is the Town buys trucks at the lowest cost, and usually not equipped with the specifications Brasslett needs. As a result, the trucks fall apart rapidly.
BOUSQUET: Right now, what does the Town of Orono have for fire protection?
CHIEF BRASSLETT: A 1959 Ford, Front mount pump.
BOUSQUET: That's it?
CHIEF BRASSLETT: That's it.
BOUSQUET: Brasslett has used up his Five Thousand Dollars maintenance budget for this year and a Two Thousand Dollar emergency loan from the City (sic). Last night Brasslett advised City Manager Ray Cota of the latest breakdown. Cota said he would get a mechanic to work on the truck on Monday. Brasslett says repairs are costly and usually take weeks because of a lack of parts for older model trucks. Chief Brasslett hopes a special Council meeting will be called this Monday or Tuesday to vote on emergency funding to buy a new fire truck. If that meeting is not held, the next regular Council meeting will be held on December Thirteenth. Despite either of these meetings, Brasslett says there will be no quick cure. In Orono, I'm Barbara Bousquet, News Center.

Prior to the interview, two firemen placed signs, which had the word "Sunkist" written on them, on one of the disabled fire trucks. The "Sunkist" signs were shown on television during the broadcast of the interview. *Cota Deposition*, at 45. While plaintiff alleges that he requested the interviewer not to film the signs, *Brasslett Deposition*, at 27, the cameraman does not recall this request, *McLeod Deposition*, at 16, and the interviewer expressly states that plaintiff made no such request, *Bousquet Deposition*, at 25. The cameraman states that he asked the plaintiff if he wanted the signs taken down during the interview and that plaintiff did not respond one way or the other, *McLeod Deposition*, at 9, and that when asked what the signs meant, plaintiff, referring to the truck on which the signs had been placed, said it was their "Sunkist," *id.* at 12.

The interview was filmed in its entirety at the fire station. Plaintiff was the exclusive source of all of the material contained in the interview. *Bousquet Deposition*, at 24–25. The interview was extensively edited prior to broadcast and the edited portions are no longer available. *See id.*, at 29.

The day after the interview the Council chairman called the town manager, who had not seen the interview, to inquire about the status of the Town's fire equipment. The town manager received unfavorable comments concerning the television interview, *Cota Deposition*, at 47, and on December 7 he went to the television station to view the tape of the broadcast. Apparently in response to a growing concern over the condition of the Town's fire equipment, as expressed by the citizenry, Council members, and department heads, the town manager requested a television interview,[6] in which plaintiff again participated, which was aired on December 8. *Cota Deposition*, at 82. In response to adverse publicity, the town manager requested that plaintiff submit a formal letter of apology, which plaintiff did, by apologizing for the unfavorable publicity and expressing his concern for the safety of his firemen. *Plaintiff's Exhibit* No. 4. In his letter of apology plaintiff indicated that the "Sunkist" signs were intended as a joke and were not intended for the public to see, much less the media. *Id.* On December 7 the town manager drafted a memorandum to the Council advising of the readiness of the Town's fire fighting equipment. *Agreed Statement of Record*, Item 12.

On December 13, 1982, largely in response to plaintiff's first television interview and the resulting adverse publicity, *see Plaintiff's Exhibit* No. 3, the Council met in executive session to discuss both the Town's fire fighting capability and plaintiff's status as fire chief. *See Cota Deposition*, at 57, 59, 63–64, 69. With plaintiff, the town manager, and all seven Council members in attendance, Council members addressed questions to the plaintiff and in an apparently informal and nonadversarial atmosphere permitted a general airing of

---

6. The text of the interview is as follows:

DON CARRIGAN [T.V. Reporter] Last weekend, this fire truck was out of service. It had a noise in the rear end which was not diagnosed until Monday. A report that Orono had only one working pumper truck caused concern in Town. The rear end problem apparently was not too serious, and the truck is now back in service. Orono still has one Fire Truck broken down. But Fire Chief Duane Brasslett and Town Manager Ray Cota told News Center today that Orono citizens still had adequate fire protection.
CARRIGAN: Do you have enough equipment to respond adequately to most situations?
CHIEF BRASSLETT: Yes, we have enough equipment to respond adequately to most situations.

TOWN MANAGER COTA: We have adequate protection; I'm not sure that it's ah, ah, where it should be, obviously, but ah, we certainly have two pumpers that are operational; we have the ladder truck that's operational; we also have the ah, ah, ah mutual aid pacts with the different communities in the surrounding areas; ah, University of Maine, Old Town, Bangor, Veazie, ah Glenburn, so that we have ah adequate protection ah under the situation.
CARRIGAN: Orono still needs another Fire Truck. The council is now looking over specifications. Cota and Brasslett hope a decision on purchase of a new truck is made fairly soon. In the meantime, they say there is enough equipment to do the job.

relevant concerns. At least two Council members expressed dissatisfaction with plaintiff's remarks during the first television interview. *Cota Deposition*, at 66. The Council asked the town manager whether he was contemplating any remedial or disciplinary action, in response to which the town manager indicated that further study was necessary. *Plaintiff's Exhibit* No. 3.

On December 14, 1982, after reviewing a tape of the interview, letters of commendation and the incidents of the previous eight months, *see Cota Deposition*, at 71, the town manager met with the plaintiff for approximately one hour and informally discussed plaintiff's tenure as fire chief, beginning with the pickup truck incident and including the most recent incident in which plaintiff's capabilities and performance as a department head had been called into question, *Cota Deposition*, at 65–66, 90; possible disciplinary actions were discussed, including dismissal and resignation. At the end of the meeting the town manager informed plaintiff that he would be dismissed. The next day the police chief delivered a formal termination letter from the town manager to plaintiff, stating the reasons for dismissal and informing plaintiff of the Town's grievance procedure.[7]

Plaintiff appealed the dismissal and the Board conducted a public hearing on December 28, 1982. Plaintiff, who was represented by counsel, and the town manager presented evidence before the Board and generally argued their cases. Members of

---

7. The termination letter reads:

December 14, 1982

TO: Duane Brasslett
FROM: Raymond J. Cota, Jr.
SUBJECT: Termination

It has become increasingly apparent that you do not have the confidence of the Town Council, a number of department heads or myself. Your judgment on two occasions in the past two months has caused a great deal of embarrassment not only to myself, but to the fire department and to the community.

The initial incident concerned a jeep which was taken out of service, placed in the rear of the fire station and then was towed to a fireman's home in another community. That action was accomplished without my prior knowledge and while I was out of town. Further, my initial information that the vehicle had been removed came from a source other than yourself.

The most recent incident and one that causes the most concern, was a television interview which occurred on December 4, 1982. In that interview, you responded to a question concerning fire protection by stating that only one piece of equipment, a 1959 pumper, was available for protection. That statement was misleading and caused a great deal of concern in the community. In fact, not only was the 1959 pumper available, but also the 1965 Dodge Pumper and the ladder truck. Not only was that equipment available, but also our mutual aid agreements were in force. Further, signs of a derogatory nature were placed on a piece of equipment and filmed. These signs were not removed from said equipment until Monday afternoon [two days later]. Although not directly responsible for the signs, not ordering their immediate removal infers your tacit approval.

You further implied that Council has not provided you with the proper equipment necessary to carry out fire suppression functions. That is a blatant misrepresentation of fact. When requested, Council has provided you with a tank truck and with additional funds in your vehicle repair account. They have been very supportive of the departments (sic) training needs.

Also, when I asked you to discipline the two individuals responsible for the signs, I was not informed as to the type of disciplinary action taken. I did receive an apology from each individual, but in neither instance was it mentioned exactly what type of disciplinary action had occurred.

I cannot understand the motive for your actions. You have caused a great deal of embarrassment to this community. Fellow department heads have been forced to answer for your statements. Town Council members have received numerous telephone calls concerning a situation which was not truly reflective of the conditions and were unjustly publicly and privately criticized for inaction.

Because of these incidents and because your credibility has dissolved, I have no choice but to dismiss you, effective immediately. You will be paid for actual time worked. As grounds for dismissal, I cite the Personnel Rules and Regulations, 1.3.12. [C.11.].

You are aware of the grievance procedure, specifically section 1.3.15. [A], and section 1.3.16.

Sincerely,
/s/ Raymond J. Cota, Jr.
Raymond J. Cota, Jr.
Town Manager

the public were invited to attend and speak. The next day and without referring to any evidence or assigning any reason, the Board recommended that plaintiff be reinstated and suggested that the town manager review and consider other, less harsh disciplinary action. On December 31, 1982, after receiving additional input from several Council members and department heads who expressed no confidence in plaintiff, *Cota Deposition*, at 72–73, 77, the town manager informed plaintiff in a two-line letter that the dismissal would "remain in effect."

## DUE PROCESS

■ In support of the claimed due process violation, plaintiff argues that he never received any pretermination notice of the reasons for the dismissal or any pretermination opportunity to challenge the dismissal. Plaintiff further contends that the Town's procedures governing employee dismissal do not comport with due process, because the nonbinding nature of the Board's recommendations to the town manager render the Board "hearing" meaningless, thereby impermissibly establishing the town manager as prosecutor, judge and jury.[8]

■ Since defendants conceded at oral argument that plaintiff had a legitimate "property interest" in his continued employment as fire chief, thereby implicating due process considerations, *see Small v.*

*Belfast*, 547 F.Supp. 761, 763 (D.Me.1982), the Court turns to consider what process was due. *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972).

■ Where there has been a deprivation of a property interest and an absence of "the necessity of quick action by the state or the impracticability of providing any predeprivation process," *Parratt v. Taylor*, 451 U.S. 527, 539, 101 S.Ct. 1908, 1915, 68 L.Ed.2d 420 (1981); *see Goss v. Lopez*, 419 U.S. 565, 582, 95 S.Ct. 729, 740, 42 L.Ed.2d 725 (1975) [students whose presence poses continuing danger to persons or property or threat of disrupting academic process may be removed immediately]; *Belnap v. Chang*, 707 F.2d 1100, 1103 (9th Cir.), *cert. denied*, — U.S. —, 104 S.Ct. 528, 78 L.Ed.2d 711 (1983) [summary dismissal of corrections director necessary to maintain orderly functioning of government], it is well established that there is a strong presumption that a public employee is entitled to some form of notice and opportunity to be heard *before* being deprived of his or her property interest. *See Memphis Light, Gas & Water Division v. Craft*, 436 U.S. 1, 19–20, 98 S.Ct. 1554, 1565–1566, 56 L.Ed.2d 30 (1978); *Board of Regents v. Roth*, 408 U.S. 564, 569–70, n. 7, 92 S.Ct. 2701, 2705 n. 7, 33 L.Ed.2d 548 (1972). *See also Burtnieks v. City of New York*, 716 F.2d 982, 987 (2d Cir.1983); *Vanelli v. Reynolds School District No. 7*, 667 F.2d 773, 778 (9th Cir.1982). Recogniz-

**8.** Plaintiff's argument that Charter section 1.3.-12(C)(11) is void for vagueness is without merit. Section 1.3.12(C) defines "sufficient cause" for disciplinary action. The relevant eleventh ground is in the nature of a "catchall," which provides that "[a]ny other such instance or situation of such seriousness that disciplinary action is considered warranted" shall be sufficient cause. Given the infinite variety of factual situations in which employee conduct might reasonably justify dismissal for "cause," it is neither feasible nor necessary to spell out in detail every type of conduct which would warrant disciplinary action. The Charter's listing of ten specific grounds justifying disciplinary action, followed by a "catchall" clause, is not so indefinite that men of common intelligence must necessarily guess at its meaning and differ as to its application. *Precious Metals Associates, Inc. v.*

*Commodity Futures Trading Commission*, 620 F.2d 900, 906 (1st Cir.1980), *citing Connally v. General Construction Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). *See Arnett v. Kennedy*, 416 U.S. 134, 161–63, 94 S.Ct. 1633, 1647–48, 40 L.Ed.2d 15 (1974) [provisions of 5 U.S.C. § 7501(a), authorizing removal or suspension "for such cause as will promote the efficiency of the service," is neither vague nor overbroad]. *See also di Leo v. Greenfield*, 541 F.2d 949, 953–54 (2d Cir.1976) [statutory standard permitting termination of tenured teacher for "other due and sufficient cause," which follows delineation of five grounds for dismissal, not vague]; *Wishart v. McDonald*, 500 F.2d 1110, 1116–17 (1st Cir.1974) [statutory standard of "conduct unbecoming a teacher" not unconstitutionally vague].

ing that "[t]he very nature of due process negates any concept of inflexible proce-dures universally applicable to every imag-inable situation," *Cafeteria Workers v. McElroy,* 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961), the timing and content of the notice, as well as the nature of the hearing, necessarily depend upon an appropriate accommodation of the competing interests involved. *See Logan v. Zimmerman Brush Company,* 455 U.S. 422, 434, 102 S.Ct. 1148, 1157, 71 L.Ed.2d 265 (1982); *Mathews v. Eldridge,* 424 U.S. 319, 334–35, 96 S.Ct. 893, 902–03, 47 L.Ed.2d 18 (1976).

■ An examination of the record reveals that plaintiff received all the process due him, despite the fact that plaintiff was dismissed and not merely suspended on December 14, 1982.[9]

■ The Charter provides for an informal attempt to resolve employee disciplinary grievances, written notice of the reasons for disciplinary action, the right to a review by the Board, which in this case included a public hearing, and a *final* review and decision by the town manager.[10] Even prior to the issuance of the formal letter of dismissal, the town manager provided plaintiff with oral explication of the reasons for dismissal and with the opportunity to discuss the matter with the town manager during a one-hour pretermination meeting on December 14, 1982. The town manager gave plaintiff written notice of the Town's grievance procedure. Plaintiff was accorded a public hearing before the Board, at which he was represented by counsel and was permitted to present evidence and present his views. The Board recommended that the town manager reinstate the plaintiff and consider less harsh disciplinary action, but assigned no reasons and related no evidence in support of its recommendation. The town manager reviewed the Board's recommendation and reaffirmed plaintiff's dismissal.

■ If plaintiff is suggesting that he was entitled to something more than the

---

**9.** As a matter of state statutory and constitutional law, plaintiff argues that he was entitled to a notice and hearing *before* he was dismissed on December 14, 1982, *see* 30 M.R.S.A. §§ 2256, 2317(N), relying on *Barber v. Inhabitants of the Town of Fairfield,* 460 A.2d 1001 (Me.1983).

In *Barber,* the town manager dismissed the chief of police "effective immediately." In his dismissal letter the town manager advised the police chief that he was entitled to a hearing before the town council and that he would continue to be paid through the date of the hearing. Four days later and prior to the hearing, the town attorney notified the police chief that he had not been dismissed, only suspended with pay. In finding that neither the police chief's statutory right to notice and a hearing before dismissal nor his right to due process had been violated, the Law Court reasoned that, by permitting the police chief to receive his salary pending a hearing, the town manager's actions amounted to a *suspension* with pay. The court observed that the town attorney's letter accordingly amended the dismissal language contained in the town manager's earlier letter. *Id.* at 1006.

On the other hand, plaintiff correctly observes that he was unequivocally dismissed on December 14, 1982. There is nothing in the record which would suggest that the dismissal was anything other than final. The parties have stipulated that plaintiff last worked and was officially separated on December 14 and that he received no compensation after that date.

Plaintiff argues that *Barber* makes clear that his statutory and constitutional rights were violated. But the Law Court's later decision in *Frye v. Inhabitants of the Town of Cumberland,* 464 A.2d 195 (Me.1983), restricts *Barber,* on similar facts. In *Frye* the Law Court found no statutory or due process violation. The court predicated its holding on the fact that the plaintiff had a statutory right to a hearing, that he was afforded adequate notice and a meaningful opportunity to be heard prior to any *final* determination by the town manager, and that plaintiff's "suggestion that a temporary lapse in procedural regularity alone should serve as grounds for this or any court to grant him reinstatement ... is patently erroneous." *Frye v. Inhabitants of the Town of Cumberland,* 464 A.2d at 198, (citing *Barber* ).

**10.** Plaintiff's equal protection argument must fail. Plaintiff incorrectly argues that because the Town Charter does not provide for pretermination notice and a hearing, he was denied the protections accorded "just cause" municipal employees under 30 M.R.S.A. §§ 2256 and 2317(N), which provide for dismissal only for just cause after notice and hearing. The Charter provides for written notice of the reasons for dismissal, a hearing before the Board and a final review and decision by the town manager. This is entirely consonant with state law. *See* n. 9 *supra.*

pretermination procedures employed here, that suggestion misperceives both the interests at stake and the function of the post-termination employment hearing. There is no doubt that plaintiff's interest in continued employment is substantial. However, the Town's interest is also substantial. The Town and, specifically, the town manager, as the duly constituted "hiring and firing" authority, have a substantial interest in the maintenance of employee efficiency and discipline. If the town manager is to carry out his responsibilities effectively he must have wide discretion and control over the management of Town personnel, including "the prerogative to remove employees whose conduct hinders efficient operation and to do so with dispatch." *Arnett v. Kennedy,* 416 U.S. 134, 168, 94 S.Ct. 1633, 1651, 40 L.Ed.2d 15 (1974) (Powell, J. concurring). The town manager must be able to act expeditiously and to remove unsatisfactory employees. The town manager concluded that he no longer had confidence in plaintiff, a conclusion apparently shared by several members of the Council, and several department heads, *see Cota Deposition,* 66, 70, 77, and that plaintiff's effectiveness as fire chief had been compromised by a discernible pattern of questionable conduct reflecting poor judgment and causing concern and embarrassment to his superiors and to the community. The town manager was entitled to exercise the prerogatives of his office by taking disciplinary action against plaintiff "and to do so with dispatch."

■ The Town's interests in dismissing, rather than suspending, plaintiff are somewhat less apparent. *See Vanelli v. Reynolds School District No. 7,* 667 F.2d at 779. Nevertheless, besides imposing an additional financial burden on the Town, suspension may unduly inhibit warranted discharges and significantly weaken the deterrent effect of immediate removal, *see Arnett v. Kennedy,* 416 U.S. at 168–69 n. 4, 94 S.Ct. at 1651 n. 4, which are particularly important considerations in this case, since plaintiff had been previously suspended by

the town manager only a few months earlier and had demonstrated questionable judgment in connection with a similar incident *following* that *suspension.* In these circumstances, it cannot be considered arbitrary or unreasonable that the town manager should conclude, in light of the proven ineffectiveness of the plaintiff's earlier suspension, that dismissal was not merely appropriate, but necessary; appropriate because plaintiff had not been deterred from a rather consistent course of questionable conduct, and necessary to maintain effective supervisory control of employee efficiency and discipline. *See Cota Deposition,* at 85.

■ As plaintiff's supervisor and the Town's "hiring and firing" authority, the town manager cannot be said to have abused his discretion by exercising the disciplinary power vested in him by the Charter, in response to the concerns of the citizenry, the Council, and some department heads. As plaintiff's direct supervisor, the town manager was in the best position to evaluate the plaintiff's performance. The town manager was specifically asked by the Council whether he contemplated disciplinary action against the plaintiff. The town manager advised that further study was necessary. The record discloses that the plaintiff and the town manager had a close working relationship. *See Cota Deposition,* at 33, 59, 69–70. More importantly and as discussed more fully below, there is nothing in the record to suggest that the town manager at any time demonstrated any bias or animosity towards the plaintiff. Their close working relationship and the absence of evidence of bias or animosity militate conclusively against any finding that the town manager undertook disciplinary action for any ulterior or improper purpose.

■ Plaintiff incorrectly argues that because the Board could only issue nonbinding recommendations to the town manager, the public hearing before the Board was "meaningless."[11] Due process re-

11. Plaintiff does not dispute the adequacy of the

Board's hearing process, but contends that the

quires a hearing, but in the context of employee dismissals there is no requirement that the decision or findings of the hearing tribunal be binding. Hearings before fact finders who issue recommendations to the ultimate decisionmaker are entirely consonant with due process. *See Board of Curators, University of Missouri v. Horowitz,* 435 U.S. 78, 85, 98 S.Ct. 948, 952, 55 L.Ed.2d 124 (1978); *Goldberg v. Kelly,* 397 U.S. 254, 258–59, 90 S.Ct. 1011, 1015, 25 L.Ed.2d 287 (1970). *See also Nevels v. Hanlon,* 656 F.2d 372, 374 (8th Cir.1981); *Frumkin v. Board of Trustees, Kent State University,* 626 F.2d 19, 20 (6th Cir.1980).

 Similarly, plaintiff has failed to present any evidence that the town manager was a constitutionally impermissible decisionmaker. Mere involvement in a case or the taking of a position, even in public, does not automatically disqualify a decisionmaker. *See Hortonville Joint School District No. 1 v. Hortonville Education Association,* 426 U.S. 482, 493, 96 S.Ct. 2308, 2314, 49 L.Ed.2d 1 (1976) [school board, negotiating union contract with teachers and having statutory authority to hire and fire, could dismiss and conduct dismissal hearings for teachers engaged in unlawful strike]. Similarly, the exercise of both investigative and adjudicative functions by the decisionmaker is not necessarily impermissible. Thus, in *Withrow v. Larkin,* 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975), the Court upheld the right of a state medical examination board to adjudicate the merits of a disciplinary action in which the board itself had investigated and filed charges. Central to the Court's holding was the absence of an impermissible risk of bias. The court reasoned that

> [t]he contention that the combination of investigative and adjudicative functions necessarily creates an unconstitutional risk of bias in administrative adjudication has a much more difficult burden of per-

suasion to carry. It must overcome a presumption of honesty and integrity in those serving as adjudicators; and it must convince that, under a realistic appraisal of psychological tendencies and human weakness, conferring investigative and adjudicative powers on the same individuals poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented.

*Id.* at 47, 95 S.Ct. at 1464.

The Court's reasoning in *Withrow* has been applied in numerous other settings. In *O'Brien v. DiGrazia,* 544 F.2d 543 (1st Cir.1976), *cert. denied,* 431 U.S. 914, 97 S.Ct. 2173, 53 L.Ed.2d 223 (1977), where the police commissioner suspended several police officers after they failed to fill out financial questionnaires as requested, the First Circuit rejected the officers' argument that the commissioner, who conducted the suspension hearings, unlawfully combined functions. The First Circuit held that "[a]ny *per se* rule [of bias] seems foreclosed by *Withrow* … [and] [w]ithout evidence of bias, the commissioner can constitutionally enforce his own orders by suspending those who disobey them." *Id.* at 547. Similarly, in *Vanelli v. Reynolds School District No. 7,* 667 F.2d at 779–80, the court rejected a claim of bias where a school board, which had met in private session and dismissed a teacher, later conducted a full evidentiary hearing and upheld its earlier dismissal. The court found that the teacher had failed to rebut the presumption of honesty and integrity on the part of the school board. *See Nevels v. Hanlon,* 656 F.2d at 376–77 [employee dismissal]; *Welch v. Barham,* 635 F.2d 1322, 1325–26 (8th Cir.1980), *cert. denied,* 451 U.S. 971, 101 S.Ct. 2049, 68 L.Ed.2d 350 (1981) [school dismissal]; *Marathon Oil Company v. Environmental Protection Agency,* 564 F.2d 1253, 1265 (9th Cir.1977) [permitting final licensing decision by regional ad-

---

hearing and the Board's subsequent recommendation were rendered nugatory by the town manager's status as final arbiter of his initial

decision to dismiss the plaintiff. *See* text at pp. 959–961 *infra.*

ministrator who had issued initial permits]. *See also Serafin v. City of Lexington, Nebraska,* 547 F.Supp. 1118, 1126–27 (D.Neb.1982).

■ The import of these cases is that whether a particular decisionmaking procedure is constitutionally defective for want of impartiality depends on a consideration of several factors, including the nature of the alleged bias and the competing interests at stake, *see Hortonville Joint School District No. 1 v. Hortonville Education Association,* 426 U.S. at 491, 96 S.Ct. at 2313, and the character of the decision being made, *see Marshall v. Jerrico, Inc.,* 446 U.S. 238, 247–49, 100 S.Ct. 1610, 1615–16, 64 L.Ed.2d 182 (1980).

■ On the present record, it is unnecessary to go beyond a consideration of bias. Nowhere in his complaint,[12] memoranda of law, deposition or oral argument has plaintiff intimated, much less made a showing of, any personal animosity, prejudice, bias or any impermissible personal stake in the outcome of his dismissal on the part of the town manager. Nor does a careful search of the record reveal any such impropriety. The record shows that after reviewing plaintiff's record and considering the views of Council members and department heads, the town manager discussed plaintiff's conduct and abilities as a department head with the plaintiff on December 14, before deciding that plaintiff would be dismissed. A public hearing was duly held before the Board. Both parties presented their evidence. Although the Board voted unanimously to recommend reinstatement of the plaintiff, it assigned no reasons and cited no evidence in support of its recommendation. After due consideration, the town manager determined that the dismissal should stand. The record does not show that the town manager, at any time, stepped beyond the bounds of his role as

town manager and so far placed himself in the role of a biased adversary that he lost the ability to conduct the affairs and responsibilities of his office in a fair and impartial manner.

This is not to suggest that the dismissal procedures employed here are necessarily the best procedures or that they are desirable in all situations. An employer's interest in maintaining the efficiency and discipline of his employees is substantial, especially where the employer and employee occupy positions of public trust. Yet "under a realistic appraisal of psychological tendencies and human weakness," *Withrow v. Larkin,* 421 U.S. at 47, 95 S.Ct. at 1464, it cannot be said that in all cases where an employer has the authority to review his prior decision, the potential for bias and prejudgment is not a considerable factor. *See id.* at 58 n. 25, 95 S.Ct. at 1470 n. 25. However, plaintiff has failed to demonstrate that either the role or the conduct of the town manager created any unconstitutional risk of bias. Accordingly, the Court concludes that plaintiff was not denied due process of law.

### FIRST AMENDMENT CLAIM

Plaintiff contends that he was dismissed in retaliation for the television interview he granted on December 4, 1982, and that his dismissal impermissibly abridged his right to speak on matters of public concern, as guaranteed by the First and Fourteenth Amendments to the United States Constitution.[13]

■ It is well established that a government employee does not relinquish First Amendment rights to comment on matters of public interest by virtue of government employment. *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). However, recognizing that this right is not absolute and that the

---

**12.** In connection with his claim for punitive damages, plaintiff alleged that the town manager acted maliciously. However, plaintiff has withdrawn the claim for punitive damages in an apparent tacit admission of the absence of any such malice.

**13.** Plaintiff again raises the argument that the Charter provision delineating "sufficient cause" is unconstitutionally overbroad. This argument is without merit. *See Janusaitis v. Middlebury Volunteer Fire Department,* 607 F.2d 17, 27–28 (2d Cir.1979). *See also* n. 8 *supra.*

state's interests in regulating the speech of its employees "differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general," *id.* at 568, 88 S.Ct. at 1734, the Supreme Court in a series of cases has fashioned guidelines for determining whether disciplinary sanctions against public employees violate their right of free speech.

Plaintiff bears the initial burden of demonstrating that the speech in question is protected, *Pickering v. Board of Education*, 391 U.S. at 568, 88 S.Ct. at 1734, and that protected speech was a substantial or motivating factor in his dismissal, *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977). Defendants then have the opportunity to demonstrate, by a preponderance of the evidence, that the same action would have been taken absent the protected activity.

*Id; Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 416–17, 99 S.Ct. 693, 697, 58 L.Ed.2d 619 (1979).

In determining whether plaintiff's speech is constitutionally protected, the Court is required to balance "the interests of the [employee], as citizen, in commenting upon matters of public concern[,] and the interests of the [Town], as an employer, in promoting the efficiency of the public service it performs through its employees." *Pickering v. Board of Education*, 391 U.S. at 568, 88 S.Ct. at 1734.[14]

To the extent that plaintiff's interview can be considered as having suggested that the Council had breached a public trust or that it was failing to discharge its governmental responsibility to provide adequate fire protection, defendants agree that the interview involved matters of legitimate public concern.[15] *See Connick v.*

---

**14.** Recognizing the diversity of factual situations presented in the public employee dispute context, the *Pickering* Court refused to adopt rigid analytical guidelines for assessing whether a public employee's speech is protected. *Pickering v. Board of Education*, 391 U.S. at 569, 88 S.Ct. at 1735. The Court did indicate some general considerations, including: (1) whether the speech was directed against those with whom plaintiff is in regular contact, such that it may impede harmony among co-workers or the ability of supervisors to maintain discipline; (2) whether the allegedly protected activity has a detrimental impact on those toward whom the employee must maintain personal loyalty and confidence for the fulfillment of job responsibilities; and (3) where there are erroneous statements involving matters of public concern, whether such statements impair the effectiveness of the employee's performance of daily duties or impede the regular operation of the employing agency. *See McDonough v. Trustees of the University System of New Hampshire*, 704 F.2d 780, 784 (1st Cir.1983).

**15.** "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers*, 103 S.Ct. at 1690. In *Connick*, the plaintiff, a former assistant district attorney who was unhappy about her pending transfer, argued that she had been improperly dismissed for compiling and distributing a questionnaire to her co-workers. The questionnaire addressed office transfer policy, office morale, the need for a grievance committee, the level of confi-

dence in supervisors and whether employees felt pressured to work in political campaigns. *Id.* at 1687. With the exception of the last question, the Court found that the questionnaire did not involve matters of public concern, but rather dealt with an internal office dispute. The Court viewed the questions as "mere extensions of [plaintiff's] dispute over her transfer" and as "an attempt to turn that displeasure into a cause celebre." *Id.* at 1690–91.

Defendants, aside from challenging the truthfulness of plaintiff's interview statements, do not address the context in which the interview occurred. Although plaintiff did not instigate the interview, *see Brasslett Deposition*, at 23, there is some evidence in the record which suggests that plaintiff's remarks were not those of a "concerned citizen," but those of an aggrieved employee frustrated over a perceived intransigence on the part of the Council in failing to satisfy his department's needs.

The issue of the purchase of a new fire truck had been before the Council for almost a year by the time of plaintiff's interview, despite several presentations by the plaintiff *and the town manager*. Apparently, two Council members had held up the purchase of the truck because of a dispute over the specifications. *Cota Deposition*, at 39–40. In testimony before the Maine Employment Security Commission on February 8, 1983, plaintiff testified that he did not believe that the Council was aware of the serious condition of the fire equipment, that he conveyed his feelings to the town manager and that he was dissatisfied with Council inaction. However,

*Myers,* 461 U.S. 138, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983). *See also Pickering v. Board of Education,* 391 U.S. at 569, 571–72, 88 S.Ct. at 1735, 1736. Similarly, defendants do not challenge plaintiff's right to criticize the Council and the town manager, or even that he elected to do so through the medium of television.

The defendants contend that plaintiff's interview was a factor in the town manager's decision to dismiss the plaintiff, not because it was a public statement, but because the town manager perceived the plaintiff as having intentionally made false and misleading statements and that, in light of plaintiff's previous course of questionable conduct, the town manager correctly concluded that plaintiff had lost his credibility and that plaintiff lacked the judgment necessary to properly conduct the affairs of his department.[16]

■ That a public employee in the course of commenting on matters of public concern may make inaccurate statements critical of or embarrassing to his superiors is, without more, insufficient to strip the employee's speech of its protected status. *See Pickering v. Board of Education,* 391 U.S. at 571–72, 88 S.Ct. at 1736. *See also Peacock v. Duval,* 694 F.2d 644, 647 (9th Cir.1982). The Court recognizes that, realistically, "erroneous statement is inevitable in free debate, and ... must be protected if the freedoms of expression are to have the 'breathing space' that they 'need ... to

survive.' " *Bose Corp. v. Consumers Union of United States, Inc.,* —— U.S. ——, ——, 104 S.Ct. 1949, 1966, 80 L.Ed.2d 502 (1984), *quoting New York Times v. Sullivan,* 376 U.S. 254, 271–72, 84 S.Ct. 710, 721, 11 L.Ed.2d 686 (1964) (citations omitted). Similarly, it is to be expected that a certain amount of

> internal unease or unpleasantness ... may follow when a government employee decides to break rank and complain either publicly or to supervisors about a situation which s/he believes merits review and reform. That is the price the First Amendment exacts in return for an informed citizenry.

*Monsanto v. Quinn,* 674 F.2d 990, 1001 (3d Cir.1982).

■ Where false statements negligently made have the effect of interfering with the employee's job performance or with the regular operation of the employee's department or where the statements are made with knowledge that they are false or with reckless disregard for their truth, false statements may not be protected.[17] *See Pickering v. Board of Education,* 391 U.S. at 570–73, 88 S.Ct. at 1735–37. *See also Santos v. Miami Region, U.S. Customs Service,* 642 F.2d 21, 25 (1st Cir.1981); *Rosado v. Santiago,* 562 F.2d 114, 117 (1st Cir.1977); *Donahue v. Staunton,* 471 F.2d 475, 478–79 (7th Cir.1972), *cert. denied,* 410 U.S. 955, 93 S.Ct. 1419, 35 L.Ed.2d 687 (1973).

plaintiff denied granting the interview for the specific purpose of pressuring the Council to act on the purchase of the new truck, a denial which is arguably supported by the fact that prior to the interview plaintiff knew the Council had unofficially approved the purchase of the truck. *Brasslett Deposition,* at 29. But this does not explain why this information was presented incorrectly during the interview. Plaintiff also denied giving the interview for the purpose of bringing the equipment shortage problem to public attention. Plaintiff contends that he granted the interview to avert a crisis over the shortcomings in the Town's fire fighting capabilities and to publicly defend the Council's actions in providing for the Town's fire fighting needs. *Brasslett Deposition,* at 29–30. It would require a strained reading of the interview to support plaintiff's contentions, especially in

light of the incompleteness and inaccuracy of much of the information plaintiff provided in the interview. *See infra,* at pp. 20–24.

**16.** Apparently, the defendants argue that plaintiff's conduct prior to the interview should be assessed not only as a factor to be considered in weighing the Town's interest but also as a separate justification for plaintiff's dismissal under *Mt. Healthy City School District Board of Education v. Doyle, supra.*

**17.** The *Pickering* Court intimated that, where it cannot be shown or reasonably presumed that knowing or reckless false statements were injurious, they might be entitled to some First Amendment protection. *Pickering v. Board of Education,* 391 U.S. at 574 n. 6, 88 S.Ct. at 1738 n. 6.

The defendants first point to the plaintiff's response to the interviewer's question as to what "fire protection" was currently available to the Town. When plaintiff responded: "A 1959 Ford, Front (sic) mount pump," the interviewer asked: "That's it?", to which plaintiff responded: "That's it." The town manager argues that not only did the Town have its mutual aid fire fighting agreements with several surrounding communities, but the fire department also had available the 1965 Dodge pumper and a ladder truck. *See Agreed Statement of Record*, Item 12.

Plaintiff argues that he did in fact itemize and discuss all of the Town's fire fighting equipment and the mutual aid agreements during the taping of the interview but that these statements were edited from the interview prior to broadcast.[18] *Brasslett Deposition*, at 31–32.

According to the television interviewer, plaintiff *never* mentioned the Town's mutual aid agreements *at any time* during the course of the interview. She does state that plaintiff discussed the Town's other fire fighting equipment prior to the taping of the interview, but there is no indication that plaintiff ever stated that the 1965 Dodge pumper was available for use. *Bousquet Deposition*, at 27–28. The cameraman does not recall plaintiff's discussing the mutual aid agreements on camera, but does remember plaintiff's mentioning the agreements off camera. *McLeod Deposition*, at 11–13.

Whether plaintiff mentioned or discussed the Town's mutual aid agreements or other fire equipment *off camera* is beside the point. First, the record supports the conclusion and plaintiff does not seriously dispute, *see Brasslett Deposition*, at 31–32, that neither the sequence nor the substance of the questions and answers here at issue was changed. *Bousquet Deposition*, at 26–27; *McLeod Deposition*, at 13. Second, even assuming that plaintiff had itemized the Town's fire fighting equip-

ment "prior to [the interviewer's] question" or that he had discussed the mutual aid agreements "previously," that would not alter the certain fact that when asked on camera what fire *protection* the Town had available, plaintiff responded by mentioning only the 1959 pumper, and by *reiterating:* "That's it."

Defendants also argue that during plaintiff's tenure as fire chief the Council extended every effort to accommodate plaintiff's requests for additional funding for the repair and replacement of fire equipment, and that plaintiff's representations in the interview to the contrary are misleading.

The record shows that the Council did expend considerable sums for the repair and replacement of the fire equipment, including an appropriation of additional emergency funds for the 1982 calendar year. Yet more importantly, the Council had already appropriated funds for the purchase of a *new* fire truck. *See Cota Deposition*, at 37–38. Despite these efforts, the Town's fire fighting equipment was old and though adequate was not at the level it should have been. Over time, several of the department's units, especially its three pumper trucks, had experienced mechanical and, to a lesser extent, structural problems which resulted in a considerable amount of "down time" for repairs. And, because the trucks were old, it was difficult to locate replacement parts. *Cota Deposition*, at 31–36.

However, plaintiff's statements in the first television interview were false in two principal respects. The plaintiff told the interviewer that the fire equipment provided by the Council was usually not equipped with the specifications plaintiff needed. And in her closing commentary, the interviewer states that plaintiff "hopes a special Council meeting will be called ... to vote on emergency funding to buy a new fire

---

**18.** Prior to plaintiff's dismissal the town manager was not only aware that plaintiff's interview had been edited, but was aware of plaintiff's allegation that he had discussed the mutual aid agreements during the course of the interview. *Cota Deposition*, at 67, 81.

truck." [19] Plaintiff concedes that prior to the interview he *knew* that the Council had already approved his specifications for the new fire truck and that the Council was "going out to bid on it," [20] *Brasslett Deposition,* at 28–29.

■ There is more than sufficient evidence in the record to support the conclusion that plaintiff's erroneous remarks were knowingly and recklessly false, that is, that plaintiff realized his statements were false or that he subjectively entertained serious doubts as to the truth or falsity of his statements. *See, e.g., New York Times v. Sullivan,* 376 U.S. at 280, 84 S.Ct. at 726.

The Town's mutual aid agreements are as integral a part of the Town's overall fire protection strategy as is its own fire fighting equipment. Plaintiff obviously was aware of this fact, yet failed, not once but twice, even to mention these agreements in response to a direct question which clearly called for an itemization of *all* available fire *protection.* The Court does not find credible plaintiff's contention that he did not mention the mutual aid agreements in his response to the interviewer's question because he had done so previously. This argument is not only inconsistent with the recollections of the interviewer and cameraman, but it is also impossible to reconcile with one of the primary reasons which plaintiff gives for having granted the interview in the first instance—to avert a crisis over the shortcomings of the Town's fire fighting capability. *See* note 15 *supra.* If plaintiff had intended to avert a crisis it is fair to assume that, irrespective of what had transpired previously, plaintiff would

have welcomed the opportunity to itemize, or even summarize, if he had discussed everything earlier, the Town's fire fighting capability. Instead, plaintiff elected to limit his response by listing only the 1959 pumper truck and to make crystal clear that this truck represented the *only* available source of fire *protection,* by reiterating: "That's it."

■ Even if plaintiff's failure to mention the mutual aid agreements in response to the interviewer's question was no more than mere negligence, his exclusive focus on the 1959 pumper truck alone was reckless, because the Town itself had *two* operational pumper trucks and a ladder truck as well, which were available to respond to a fire; plaintiff was well aware of these facts.

Of the Town's three pumper trucks, one was out of service and a second had developed a rear end "noise" the night before the interview.[21] *Brasslett Deposition,* at 35. The record reveals that when plaintiff reported the problem to the town manager, they discussed the severity of the problem and agreed that the pumper could be driven to a fire in the exercise of reasonable caution. *Cota Deposition,* at 44. In his deposition, plaintiff characterized the use of the pumper as "questionable," *Brasslett Deposition,* at 35; the pumper was fully repaired within four days. *See* n. 6 *supra.*

There is no question that plaintiff's statements to the interviewer concerning the relevant equipment specifications and the purchase of a new truck were recklessly false. Even though the Council had not officially acted on the purchase, *see* note 20

---

19. Plaintiff does not argue either that these statements were edited or that the interviewer incorrectly presented the substance of plaintiff's remarks.

In addition, there is nothing in the record which indicates in what, if any, respect the fire equipment purchased by the Council during plaintiff's tenure as fire chief failed to meet plaintiff's specifications. The dispute appears to have been limited solely to the proposed specifications of the new pumper truck. *See* n. 15 *supra.*

20. The Council did not officially vote to accept bids on the truck until December 13, the day before plaintiff was dismissed. *Cota Deposition,* at 39.

21. Plaintiff contends that he did not tell the interviewer that the rear end had "dropped out" of the truck, but that the rear end had developed a noise. *Brasslett Deposition,* at 34–35. The interviewer specifically recalls that she asked plaintiff to explain what had happened to the truck and that his exact words were as they appeared in the interview: that the rear end had "dropped out." *Bousquet Deposition,* at 41–42.

*supra,* plaintiff was aware that the Council had approved his specifications and that it was about to obtain bids on the truck. And, just as with plaintiff's gross understatement of the fire *protection* available to the Town, it is extremely difficult to reconcile plaintiff's remarks in light of yet another stated reason for granting the interview—to publicly *defend* the Council's actions in providing for the Town's fire fighting needs. *See* note 15 *supra.* Plaintiff's statements were more an indictment than a defense of the Council.

Plaintiff's knowing and reckless false statements were not peripheral but went directly to the heart of the subject matter of the interview. More importantly, the statements were not ambiguous. Their plain meaning could hardly have been lost on the public. *See Brasslett Deposition,* at 28–29. *See also Bose Corp. v. Consumers Union of United States, Inc.,* — U.S. at ——, 104 S.Ct. at 1966. However, because some of plaintiff's remarks during the interview were correct,[22] the Court is required to give full consideration to the Town's interest, as employer, "in promoting the efficiency of the public service it performs through its employees."

The governmental structure of the Town is small, consisting of the seven-member Council and the nine Town departments. The town manager is the direct supervisor of all department heads and is alone responsible for their official conduct. The size of the Town's governmental apparatus and the hierarchical proximity of the plaintiff, as a department head, to the town manager, as his direct supervisor, brought the two in frequent and necessary contact.

The record discloses that the Town's administrative business was conducted largely on an informal and personal basis. The town manager met with department heads on a weekly basis to consider specific items and to discuss generally any other items of Town interest and local concern. *Cota Deposition,* at 14. The record also reveals that, though at times strained, plaintiff and the town manager had a good working relationship and that they communicated with each other well, mostly in person. In addition, the plaintiff and the town manager frequently worked together, as when submitting fire department requests to the Council. *Cota Deposition,* at 33.

Given the manner in which the Town's administrative business was conducted and, specifically, the close working relationship which did exist between the plaintiff and the town manager and which was a necessary ingredient in the orderly and efficient administration of the Town, *see McBee v. Jim Hogg County,* 730 F.2d 1009 (5th Cir. 1984) [closeness of working relationship is a function of the particular public responsibility being carried out], it was not only necessary for the town manager to have confidence in the plaintiff, but reasonable for him to expect a degree of personal loyalty from the plaintiff as well. *See, e.g., Anderson v. Evans,* 660 F.2d 153, 159 (6th Cir.1981) [impact of teacher's statements in small school]; *Cooper v. Johnson,* 590 F.2d 559, 562 (4th Cir.1979) [11-person police force requires mutual confidence and cooperation]; *Janusaitis v. Middlebury Volunteer Fire Department,* 607 F.2d 17, 26 (2d Cir.1979) [carping criticism and abra-

---

**22.** That at least three statements contained in the interview were knowingly and recklessly false does not mean that the entire interview is stripped of its protected status. *See Pickering v. Board of Education,* 391 U.S. at 583–84, 88 S.Ct. at 1742–43 (White, J., concurring in part and dissenting in part). However, the falsity of the statements is clearly relevant, not only to their effect on the plaintiff's ability to perform his job, but to the Town's burden in justifying plaintiff's dismissal. The Court in *Connick* observed that "the state's burden in justifying a particular discharge varies depending upon the nature of the employee's expression." *Connick v. Myers,*

103 S.Ct. at 1692–93. Although the issue in *Connick* was whether an employee's questionnaire dealt with a matter of public concern, *see* n. 15 *supra,* the Court's reasoning is also applicable to employee speech which, at least in part, is false. It is reasonable to conclude that where a public employee makes knowing or reckless false statements, the corresponding burden of the employer in justifying dismissal should be lowered accordingly, with due consideration to the "harm" resulting to the employing agency and the employment relationship. *See* n. 17 *supra.*

sive conduct have no place in small organization which depends upon mutual loyalty]. *Compare, Czurlanis v. Albanese*, 721 F.2d 98, 106 (3d Cir.1983) [personal loyalty and confidence unnecessary where mechanic is not normally in contact with employer]; *Berdin v. Duggan*, 701 F.2d 909, 912 (11th Cir.), *cert. denied*, —— U.S. ——, 104 S.Ct. 239, 78 L.Ed.2d 230 (1983), [no close working relationship between maintenance crewman and mayor].

As the Supreme Court has observed, "[w]hen close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate." *Connick v. Myers*, 103 S.Ct. at 1693. Substantial deference to the town manager's judgment is clearly called for on the present record.

As fire chief, plaintiff possessed the expertise and information necessary to present an informed evaluation of the Town's fire fighting capability and by taking it upon himself to address the public, not as a citizen, *see Pickering v. Board of Education*, 391 U.S. at 572, 88 S.Ct. at 1736; *Czurlanis v. Albanese*, 721 F.2d at 104, but in his official capacity as fire chief and department head, the town manager was entitled to expect that plaintiff would present the facts correctly. Plaintiff's failure to do so, when considered in light of his previous questionable conduct, led the town manager reasonably to conclude that not only had his ability to work with and place confidence in the plaintiff been impaired, but that plaintiff's effectiveness as a department head had been impaired as well. *See Cota Deposition*, at 84.

Obviously, the adverse public attention and serious concern generated by plaintiff's interview embarrassed and may even have angered the town manager and the Council. However, the embarrassment engendered by the interview was not, as plaintiff contends, solely because the Town's fire fighting capability was questionable. The town manager conceded as much in his December 8 interview. The cause of the embarrassment, as evidenced by the town manager's termination letter, was the fact that plaintiff had made erroneous statements and that the town manager, as well as a number of department heads and Council members, were placed in the unwarranted position of having to answer for an errant employee's erroneous public statements.

Moreover, plaintiff's remarks were disruptive.[23] The interview created an artificial crisis which was not accurately reflective of the true state of affairs. As a result, the town manager was compelled to address a memorandum to the Council advising them of the readiness of the Town's fire equipment and to request a second television interview. Although the town manager's efforts may have served to rebut plaintiff's erroneous statements and to counter some of the unwarranted public concern caused by plaintiff's interview, *see Pickering v. Board of Education*, 391 U.S. at 572, 88 S.Ct. at 1736, the entire incident, separate and apart from the adverse public impact of the interview, did disrupt close working relationships by diminishing considerably the trust and confidence the town manager was able and willing to place in the plaintiff, thus further impairing plaintiff's effectiveness as a department head.

The full extent of the disruption in close working relationships can be properly evaluated only in light of plaintiff's conduct in the eight months prior to his dismissal. Aside from the jeep incident, *see* p. 968 *infra*, plaintiff's competence and reliability as a department head had been called into question previously by the town manager in connection with plaintiff's disposal of a Town pickup truck and the improper reten-

---

23. The *Connick* Court notes that it is not necessary "for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action," *Connick v. Myers*, 103 S.Ct. at 1692–93, but cautioned that "a stronger showing may be necessary if the employee's speech more substantially involved matters of public concern." *But see McKinley v. City of Eloy*, 705 F.2d 1110, 1115 (9th Cir.1983) [requiring evidence of actual disruption].

tion of the sale proceeds. This incident is clearly relevant in weighing the Town's interest generally and in assessing the town manager's actions specifically. Moreover, the town manager's doubts about the plaintiff's judgment as a result of the pickup truck incident were exacerbated by the episode over the "Sunkist" signs. Apart from whatever message the signs might conceivably have been intended to convey, an elucidation which plaintiff has not offered, *see Plaintiff's Exhibit* 4, it was not simply that the signs, by intimating that the fire truck was a "lemon," *Cota Deposition*, at 46, were derogatory or that they appeared in the interview. Rather, it was that the plaintiff thought the signs were a joke and did not remove them until the town manager personally went to the fire station and ordered their removal.[24] *Cota Deposition*, at 46, 83. Plaintiff's failure to reprimand or discipline the responsible firemen as requested by the town manager, *Cota Deposition*, at 50, occurred in such close temporal proximity to plaintiff's first television interview as to lead the town manager reasonably to conclude, upon the basis of a *pattern* of questionable conduct, that he could no longer work with the plaintiff.

■ The detrimental impact which plaintiff's knowing and reckless false remarks had upon the personal loyalty and mutual confidence essential to the maintenance of a close working relationship and

the interests of the town manager in maintaining employee efficiency and discipline satisfy the Court that the Town's interest in the orderly administration of its affairs outweighed the plaintiff's interest in commenting irresponsibly upon matters of public concern.

Even assuming that plaintiff's speech was protected and that it was a substantial or motivating factor in his dismissal, the defendants have demonstrated, by a preponderance of the evidence, that plaintiff would have been dismissed absent the protected speech.

Even before the first television interview, the town manager had determined to assess plaintiff's job performance in light of the pickup truck and jeep incidents.[25] *Cota Deposition*, at 55. Although the pickup truck incident is not mentioned in the town manager's termination letter as one of the reasons for plaintiff's dismissal, the town manager did discuss this incident with the plaintiff during · their informal meeting on December 14 and it was clearly an important consideration in the town manager's decision. *See Tygrett v. Barry*, 627 F.2d 1279, 1283, 1286 (D.C.Cir.1980) [courts are limited to contemporaneous evidence of actual reasons for dismissal]. The town manager has stated that his decision to dismiss the plaintiff, rather than impose less severe disciplinary measures, was

---

**24.** At oral argument plaintiff agreed that, had plaintiff "ratified" the placement of the "Sunkist" signs on the fire truck, insubordination under Charter section 1.3.12(C)(10) would have been an appropriate ground for dismissal. The record is clear that plaintiff was not only aware of the signs at the time of the interview, but that he made no effort to secure their removal and, in fact, expressly acknowledged their existence in a manner which constituted "ratification" of the signs. *See* p. 955 *supra.*

**25.** The plaintiff points to the fact that he received three merit pay increases, the third having occurred during the month in which he was discharged, as evidence that the town manager would not have dismissed him but for his participation in the interview. A "merit" or "step" increase, unlike an across-the-board pay raise, is granted by the town manager upon a determination that the employee's work during the previ-

ous year has been satisfactory. Charter § 1.3.-5(D)(2). *See Cota Deposition*, at 9. The town manager argues that the step increase, which is generally granted on the employee's anniversary date, is routinely granted and more closely resembles a pay raise based on longevity rather than on merit. The town manager contends that plaintiff's step increase in December 1982 was automatically granted because it was plaintiff's employment anniversary. The town manager claims that he did not personally approve plaintiff's step increase, due to plaintiff's conduct *prior to the interview*, and that he had intended to review plaintiff's job performance when the television interview episode occurred. *Cota Deposition*, at 51–52, 55. If anything, the fact that the town manager did not *block* plaintiff's raise speaks to the absence of any *bias* against plaintiff.

based on the fact of plaintiff's previous suspension. *Cota Deposition*, at 85.

The jeep incident cannot be used as a justification for plaintiff's discharge. Not only did the plaintiff inform the town manager of the jeep's removal, but the town manager's response does not suggest that plaintiff's conduct was in any respect improper. Moreover, after the jeep was returned, no disciplinary action was taken, nor does it appear that the town manager ever mentioned this incident to the plaintiff prior to his dismissal. *See Clary v. Irvin*, 501 F.Supp. 706, 707–08 (E.D.Tex.1980) [post-dismissal justifications insufficient where employee was never disciplined or informed that alleged misconduct was improper]; *Cooper v. Ross*, 472 F.Supp. 802, 812 (E.D.Ark.1979) [reasons for dismissal were hastily prepared make-weight justifications not accurately reflecting true motivation for dismissal].

Setting aside any consideration of the jeep incident, however, the circumstances surrounding the warranted, but apparently ineffective, suspension of plaintiff for his conduct in connection with the pickup truck, the episode involving the "Sunkist" signs and plaintiff's failure to discipline the firemen responsible, as well as plaintiff's knowing and reckless false interview statements, provide adequate support of defendants' contention that the town manager would have reached the same decision as to plaintiff's dismissal in the absence of any protected speech.

Accordingly, and for the reasons hereinabove set forth, the plaintiff's complaint is DISMISSED.